[No. B036179. Second Dist., Div. One. May 23, 1989.]

MICHAEL L. STRATTON, Plaintiff, v.
FIRST NATIONAL LIFE INSURANCE COMPANY, Defendant,
Cross-defendant and Appellant;
CONTINENTAL ASSOCIATION OF RESOLUTE EMPLOYERS et
al., Defendants, Cross-complainants and Respondents.

**COUNSEL**

Cummins & White, James R. Wakefield and Ted G. Schwartz for Defendant, Cross-defendant and Appellant.

Barger & Wolen and Gail E. Cohen for Defendants, Cross-complainants and Respondents.

---

**OPINION**

**HANSON, J.**—On January 23, 1985, plaintiff Michael L. Stratton ("plaintiff" and/or "Stratton") filed a complaint against defendants First National Life Insurance Company (hereinafter FN Life), California Pacific Life Insurance Company (hereinafter CP Life), Continental Association of Resolute Employers (hereinafter CARE), and Does. The complaint stated six causes of action, for (1) declaratory relief; (2) breach of contract; (3) bad faith; (4) fraud; (5) breach of statutory duties (Ins. Code, § 790.03); and (6) emotional distress.

### INTRODUCTION AND PROCEDURAL HISTORY

Plaintiff is a medical doctor who became seriously ill with liver disease in 1982. Defendants FN Life and CP Life are insurers who accepted premiums from plaintiff for medical insurance coverage under a group policy issued by defendant CP Life in May 1982 to plaintiff's employer, Lebedeff and Stratton, Inc., through the entity known as CARE, described as an employer's association. The policy assertedly was assumed by FN Life effective January 1, 1983.

Plaintiff was an included employee pursuant to the policy, entitled to major medical coverage with a maximum of $1 million. Plaintiff asserted below that both of these defendants refused to pay plaintiff's medical expenses after March 30, 1984, with catastrophic results for plaintiff; plaintiff was forced to undergo a liver transplant operation in August 1984, and, it is asserted, was financially destroyed, reduced to being provided the essentials of life by the charity of his friends.

Defendants CP Life and CARE answered plaintiff's complaint on January 10, 1986; defendant FN Life filed its answer on March 26, 1986. FN Life also filed a cross-complaint against CP Life and CARE, for declaratory relief and indemnity; FN Life charged that CP Life and CARE had "failed to place and maintain" Stratton's coverage prior to FN Life's assumption of the risk. Defendants CP Life and CARE (in concert in this litigation) filed a cross-complaint against FN Life for declaratory relief and equitable indemnity; CP Life-CARE asserted that FN Life was responsible for plaintiff's medical coverage.

Defendants CP Life and CARE sought summary judgment against plaintiff Stratton and defendant FN Life. On December 14, 1987, the motion for summary judgment was heard in the trial court. A minute order was issued that day declaring that defendants CP Life and CARE were entitled to summary judgment against plaintiff and FN Life. The minute order expressly directed defendants CP Life and CARE to prepare a judgment. Defendants CP Life and CARE served notice of ruling on December 21, 1987, and filed it on December 22, 1987.

Counsel for FN Life asserted that he did not receive notice of ruling until December 28, 1987. On January 7, 1988, FN Life filed a motion for reconsideration of the ruling of December 14, 1987, pursuant to Code of Civil Procedure section 1008. Defendants filed opposition to the motion for reconsideration.

On March 11, 1988, the trial court again ruled in favor of CP Life and CARE and a judgment was entered that day. On May 16, 1988, CP Life and CARE served FN Life with the judgment of March 11, 1988, and notice of entry of judgment. FN Life filed its notice of appeal on July 6, 1988. Plaintiff Stratton did not file a notice of appeal. The parties before this court are the two insurers and CARE. The parties on appeal entered into a joint stipulation electing to prepare the appellate record pursuant to California Rules of Court, rule 5.1.

### TIMELINESS OF APPEAL

After the appellate briefs were filed and pending oral argument in this court, we advised the parties by letter on February 2, 1989, that an additional issue was present in the case, i.e., the timeliness of FN Life's appeal, in light of California Rules of Court, rule 3(b). The parties were invited to submit letter briefs if they so desired and to be ready, in any event, to address the timeliness issue at oral argument. FN Life responded by letter brief, arguing that the appeal was governed by California Rules of Court, rule 2(a), rather than rule 3(b), and was timely.

At oral argument the parties relied on *Blue Mountain Development Co.* v. *Carville* (1982) 132 Cal.App.3d 1005 [183 Cal.Rptr. 594] and *Tunis* v. *Barrow* (1986) 184 Cal.App.3d 1069 [229 Cal.Rptr. 389] as establishing that California Rules of Court, rule 2(a) applied to their appeal rather than rule 3(b). *Tunis* relied on *Blue Mountain* and we will address the issue presented by *Blue Mountain*.

The timeliness issue arises because after judgment in the trial court on December 14, 1987, defendant FN Life filed a motion for reconsideration

pursuant to Code of Civil Procedure section 1008. The appeal was not taken until July 6, 1988. We must determine whether the timeliness of FN Life's appeal is governed by California Rules of Court, rule 2 or by rule 3. If governed by rule 2, the appeal was timely; if governed by rule 3, the appeal was not.

██ The importance of applying the correct rule to a given factual situation cannot be overemphasized because the timeliness of an appeal is a *jurisdictional* issue. Under the present rules, a reviewing court has considerable discretion in permitting the late filing of motions and briefs *after* the timely filing of a notice of appeal, but it has *no* discretion to relieve any party from the duty to file the notice of appeal itself within the time frames of California Rules of Court, rules 2 or 3. The applicable time frame is mandatory; the reviewing court has no jurisdiction to act upon an untimely appeal. (*Estate of Hanley* (1943) 23 Cal.2d 120 [142 P.2d 423, 149 A.L.R. 1250]; *Hollister Convalescent Hosp., Inc.* v. *Rico* (1975) 15 Cal.3d 660, 674 [125 Cal.Rptr. 757, 542 P.2d 1349].)

Rule 2(a) provides, in pertinent part, that "[a] notice of appeal shall be filed within 60 days after the date of mailing notice of entry of judgment by the clerk of the court . . . or within 60 days after the date of service of written notice of entry of judgment by any party upon the party filing the notice of appeal, or within 180 days after the date of entry of judgment, whichever is earliest, unless the time is extended as provided in rule 3."

Defining what constitutes "entry of judgment" has provided some problems when computing the timeliness of an appeal under rule 2. For the purpose of our discussion here, rule 2(b)(2) provides that "[t]he date of entry of an appealable order which is entered in the minutes shall be the date of its entry in the permanent minutes, *unless such minute order as entered expressly directs that a written order be prepared, signed and filed, in which case the date of entry shall be the date of filing of the signed order.*" (Italics added.)

Ordinarily, rule 2 controls the timeliness of the filing of a notice of appeal in civil matters; in subdivision (c) the problem of premature filing is addressed, conferring upon this court the discretion, for good cause, to treat a premature notice of appeal as a valid filing from a judgment subsequently entered in the trial court.

Rule 3 governs the situation which arises when a party seeks postjudgment relief in the trial court. Rule 3(a) provides specifically for a new trial motion in the trial court, and states that when such a motion is filed and denied, "the time for filing the notice of appeal from the judgment is *exten-*

*ded for all parties until 30 days after either entry of the order denying the motion or denial thereof by operation of law,* but in no event may such notice of appeal be filed later than 180 days after the date of entry of the judgment whether or not the motion for new trial has been determined." (Italics added.) By permitting a limited extension, the rule is intended to be of assistance to parties seeking postjudgment relief below, but is not intended to permit parties to proceed in dilatory fashion.

Subdivision (b), added by amendment in 1983, is described in the "Draftsman's Explanatory Notes" as applying the theory of (the 30-day extension) "to the various motions to vacate a judgment. A time limit is placed on the extension, roughly in conformity with the new trial provision."

The subdivision provides, as follows: "When a valid notice of intention to move to vacate a judgment or to vacate a judgment and enter another and different judgment is served and filed by any party on any ground within the time in which, under rule 2, a notice of appeal may be filed, or such shorter time as may be prescribed by statute, the time for filing the notice of appeal from the judgment is extended for all parties until the *earliest* of 30 days after entry of the order denying the motion to vacate; or 90 days after filing the first notice of intention to move to vacate the judgment; or 180 days after the entry of the judgment." (Italics added.)

■ As with construction of statutes, interpretation of the court rules is governed by certain general principles. It is our task to determine the intent of the draftsmen, including the perceived objective of the rules; to attribute to the rules their clearly expressed purpose and meaning; and to bear in mind the interrelation of the rules within the entire framework presented, arriving at a logical, reasonable and fair result. The analysis should consider, too, the case law already developed concerning proper interpretation of the rules.

At issue in the present case is the effect, if any, on the timeliness of appeal occasioned by FN Life's motion for reconsideration. ■ The question is whether rule 3(b) was intended to encompass motions for reconsideration as well as motions to vacate.

In *Blue Mountain Development Co. v. Carville, supra,* 132 Cal.App.3d 1009-1010, the Court of Appeal held, among other things, that "[a] motion for reconsideration under Code of Civil Procedure section 1008 is treated for purposes of rule 3 of the Rules of Court in the same manner as a motion for new trial or a motion to vacate. [Citation.] In other words, subject to the qualifications stated in Rule 3, the timely filing of a motion to reconsider

normally extends the time for filing a notice of appeal from the original ruling until 30 days after entry of the order denying reconsideration."

There is merit in *Blue Mountain*'s holding on this point. The *purpose* of a motion for reconsideration is much the same as a motion for new trial or to vacate a judgment; that purpose is to persuade the trial court to make a different order or judgment, one not adverse to the party so moving. Furthermore, motions for reconsideration in the trial court involve the same timing problem as other postjudgment motions; a limited extension of time in which to seek further relief below is warranted.

*Blue Mountain* has been criticized (see Cont.Ed.Bar. Appellate Practice 2d, § 7.44) but the same Court of Appeal vigorously defended its basic ruling in a recent decision, *Rojes* v. *Riverside General Hospital* (1988) 203 Cal.App.3d 1151, 1159-1160 [250 Cal.Rptr. 435].) In *Rojes,* the court observed that the court rules could have been amended since 1982 to reject *Blue Mountain*'s holding if that had been considered appropriate.

The court also declared that "this rule promotes the policy of favoring applications for relief and resolution of issues in the trial court. To rule otherwise would deter counsel from availing themselves of the remedy provided by Code of Civil Procedure section 1008. If faced with a choice of preserving their right to appeal or filing a motion for reconsideration, counsel certainly would choose to file a notice of appeal. If counsel had filed a motion for reconsideration and the deadline for filing a notice of appeal approached, prudent counsel would file the notice of appeal thereby divesting the trial court of jurisdiction to rule on the motion for reconsideration." (200 Cal.App.3d at p. 1159.)

Another consideration, of course, is equality of application of rules governing the timeliness of a notice of appeal. Once rule 3 applies, the 30-day extension runs from *entry* of a ruling denying reconsideration, not from service of notice of the ruling on the other side (see *City of Long Beach* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1114, 1118 [225 Cal.Rptr. 227]). It seems unfair to permit counsel to prolong proceedings below by filing a motion for reconsideration relying on "the 60-day rule" (rule 2(a)), when counsel making the other statutory postjudgment motions described in rule 3 must be cognizant of the 30-day time frame *and* the fact that the notice provisions of rule 2 do not apply when computing the extra 30 days.

*Blue Mountain,* however, was premised on the notion that motions for reconsideration are directed *only* at appealable orders, and that is where its broad statement of principle has been somewhat misleading. *Blue Mountain* itself involved a motion for reconsideration directed at an appealable order,

but in declaring the general applicability of rule 3, it did not say that. It is noteworthy that when the recent case, *Rojes,* quoted the language employed in *Blue Mountain,* the body of its quotation includes, in brackets, *"if the original ruling is an appealable order."* (Italics added.) (*Rojes* v. *Riverside General Hospital, supra,* 203 Cal.App.3d 1151, 1159.) This language was not included in the *Blue Mountain* opinion, but serves to clarify the original holding.

The limitation of rule 3 to "original rulings (which are) appealable orders" is, of course, in keeping with the conceptual underpinnings of the court rules. California Rules of Court, rule 40(g), declares that whenever the word "judgment" is used in the court rules, it refers to "any judgment, order or decree *from which an appeal lies.*" (Italics added.) In addition, the language of 3(b) refers to motions undertaken during the time period open to appeals; clearly rule 3(b) addresses only appealable orders.

Some problems, however, result from the *Blue Mountain* holding, occasioned by the nature of motions for reconsideration as defined by Code of Civil Procedure section 1008. Code of Civil Procedure section 1008 permits such motions to be directed toward orders; it does not specify that such orders be *appealable* orders. Frequently, when a court has sustained a demurrer without leave to amend (5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 934, pp. 370-371) or has granted a summary judgment (*George Ball Pacific, Inc.* v. *Coldwell Banker & Co.* (1981) 117 Cal.App.3d 248 [172 Cal.Rptr. 597]) the court will entertain a timely motion for reconsideration of the order, which is interlocutory in nature.

There are situations where an order is only technically an interim order, because it can be transformed into an appealable judgment by the entry of a formal judgment of dismissal (in the case of demurrers sustained without leave to amend) or other formal judgment, including summary judgment. This circumstance, not involved in *Blue Mountain,* requires additional discussion since it was involved in the case before us.

■ Here the trial court awarded defendants CP Life and CARE summary judgment in a minute order on December 14, 1987. The court's ruling was an interim order, and not an appealable judgment, because the minute order expressly directed counsel for CP Life and CARE to prepare a judgment. Counsel for CP Life and CARE served notice of ruling on Stratton and FN Life, but had not prepared a judgment when FN Life filed its motion for reconsideration.

No judgment (of which we are aware) was filed prior to the hearing on the reconsideration motion, although it was within the power of defendants

to do so; the motion for reconsideration filed by the losing side did not affect the capability of the winners in that regard. Had such a judgment been filed prior to reconsideration, this court would have been required to apply rule 3(b) to this appeal; the motion for reconsideration would have been deemed directed at the subsequently entered judgment. The entry of judgment, on March 11, 1987, would have triggered the 30-day extension period provided by rule 3(b) without notice, and FN Life would have only had until April 11, 1987, to file a notice of appeal.

The judgment actually filed on March 11, 1988, had been "reconsidered" by the trial court. In this court, FN Life has claimed that rule 3(b) had no application at all because the reconsideration motion was directed at a ruling which was not perfected as a judgment pending reconsideration. FN Life further argues that rule 2(a) permitted FN Life to await notice of entry of judgment (May 16, 1987) and file a notice of appeal on July 6, 1987— within 60 days of notice of entry of the "reconsidered" judgment. CP Life and CARE agreed with this interpretation at oral argument.

FN Life is correct in asserting that rule 2 applies and the fact that the appealable judgment was entered on March 11, 1988, entitled it to await notice of entry of judgment and 60 days thereafter in which to perfect its appeal. FN Life was not responsible for the fact that the summary judgment was not entered as directed by the trial court, nor was it responsible for the long delay in receiving notice of entry of judgment.

■ To summarize, where the order or judgment is appealable (*Blue Mountain, supra,* 132 Cal.App.3d 1005), motions for reconsideration will be governed by rule 3(b).

Where the order is not appealable due to its lack of finality, motions for reconsideration will not come under rule 3(b).

Where an order or ruling is clearly an interim order *only* in the sense that the filing and entry of a subsequent formal judgment is required, and reconsideration is sought, the prevailing party or parties can invoke rule 3(b) by filing the formal document before the motion is heard. Nothing in the court rules prevents the trial court from still reconsidering its ruling and making an appropriate order should it change its mind. The formal judgment filed would then, of course, have no lasting effect. More routinely, however, motions for reconsideration are denied, and our discussion here hopefully will encourage equal treatment, for appellate purposes, of such motions along with other statutory motions directed at appealable judgments, so that all similarly situated parties will receive the limited extension provided by rule 3(b).

In the case at bench, having determined that the appeal was governed by rule 2(a) and was timely, we proceed now to address the merits of the appeal.

### STANDARD OF REVIEW

California Code of Civil Procedure section 437c requires the trial court to grant summary judgment in a case if no triable issue exists as to a material fact, and if the papers submitted on the motion entitle the moving party to judgment as a matter of law. Summary judgment proceedings may, as they did here, also raise questions of law.

Section 437c, subdivision (d), provides that "Supporting and opposing affidavits or declarations shall be made by any person on personal knowledge, shall set forth admissible evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." ■ The moving party's affidavits are strictly construed by the trial court, and the opponent's affidavits are liberally construed; doubts about the propriety of granting the motion are resolved by denying summary judgment, due to the drastic nature of the procedure. (*Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785].) ■ "Where as in the case at bar, a *defendant* seeks summary judgment, his declarations and evidence must either establish a complete defense to plaintiff's action or demonstrate an absence of an essential element of plaintiff's case. If defendant establishes the foregoing, and the plaintiff's declaration in reply does not show that there is a triable issue of fact with respect to that defense or that an essential element exists, the summary judgment should be granted. [Citation.]" (Italics in text; *Dolquist* v. *City of Bellflower* (1987) 196 Cal.App.3d 261, 266 [241 Cal.Rptr. 706].)

■ These general principles also apply to an appellate court's review of a summary judgment ruling, except that an appellate court examines the facts presented to the trial judge on a summary judgment motion and independently determines their effect as a matter of law. (*Bonus-Built, Inc.* v. *United Grocers, Ltd.* (1982) 136 Cal.App.3d 429, 442 [186 Cal.Rptr. 357].) We also conduct independent review of the trial court's determination of questions of law. We are not bound by the trial court's stated reasons, if any, supporting its ruling; we review the ruling, not its rationale. (*Barnett* v. *Delta Lines, Inc.* (1982) 137 Cal.App.3d 674, 682 [187 Cal.Rptr. 219].)

In the case before us, the dispute between the parties involved the interpretation of writings: the "assumption and reinsurance" contract between

FN Life and CP Life, the terms of the "master contract" held by CARE, and certain provisions of the Insurance Code.

■ Where the meaning of writings is in dispute, "in the absence of conflicting evidence, the question is one of law, and . . . the reviewing court will give the writing its own independent interpretation. . . ." (9 Witkin, Cal. Procedure, *supra*, Appeal, § 294, p. 305; see also *Parsons* v. *Bristol Dev. Co.* (1965) 62 Cal.2d 861 [44 Cal.Rptr. 767, 402 P.2d 839].) However, "[t]he long established rule, still followed, is that where . . . extrinsic evidence [concerning the meaning of writings] has been properly admitted and the evidence is in conflict, any reasonable construction by the lower court will be upheld under the general rule of conflicting evidence. [Citations.]" (9 Witkin, *supra*, § 293, p. 304.)

With these considerations in mind, we state the facts and issues developed by the summary judgment motion papers, both by the proponents (CP Life and CARE) and the opposing parties (FN Life and plaintiff Stratton).

## FACTUAL STATEMENT

On April 7, 1982, the employer of plaintiff Michael Stratton, M.D., a medical corporation, Lebedeff and Stratton, Inc., applied for membership in an association known as CARE and, through CARE for a medical policy covering six corporation employees, including plaintiff Stratton.

The record, which is not complete, tells us very little about CARE, except that it is an association of employers; it has pleaded that it is not an insurance company governed by the provisions of the Insurance Code. On CARE's application policy, signed by Lebedeff on behalf of the medical corporation, *in very fine print* above the place for that signature, is the following (in pertinent part): "The Employer Membership Application must be approved before individual applications are considered. It is expected that the Employer will contribute a substantial portion of the total cost of the plan. On behalf of the firm and its eligible employees, the employer subscribes and agrees to be bound by all terms and conditions governing the Continental Association of Resolute Employers, including, but not limited to, *the absolute right of the Trustees to modify, amend or change coverages and/or charges of the membership and/or dependents without approval or consent of participating members or Employer firms*. Further, Trustees are hereby authorized to place premium payments in interest bearing accounts, interest which is to be applied solely for the benefit of the Members of the Continental Association of Resolute Employers." (Italics added.)

It seems clear that CARE held the "master contract," i.e., the policy issued by the insurer; upon accepting an employer application, certificates

were issued by the insurer to the beneficiaries (the insured employees) as evidence of coverage.

Effective May 1, 1982, CARE obtained insurance from defendant CP Life for the Lebedeff-Stratton employees for a monthly total premium of $252.66. Plaintiff's coverage was for medical benefits, and it is uncontroverted that the premiums were paid in some manner. Stratton became totally disabled from liver disease and was unable to work after December 17, 1982.

In 1983, defendant CP Life, defendant CARE, and another entity, California Pacific Insurance Services (CPIS), (described as the "administrator" of CARE's insurance plans) were engaged in negotiations with FN Life concerning the assumption by FN Life of most of the policies of medical insurance which had been written by CP Life in California, including the policy obtained by plaintiff Stratton's employer in May 1982 which covered Stratton. It is important to note that nowhere in our record is there any indication that the policies that CP Life wished to sell were approaching a discontinuance date; they were being sold "mid-risk." There is no evidence in our record explaining why CP Life wished to dispose of the bulk of its California business. The record does not contain any evidence concerning the financial stability of either insurer. The record does indicate that the negotiating parties had done business before. It has been asserted in this litigation that the other entities involved in the negotiation, CARE and CPIS, were created by defendant insurer CP Life and controlled by CP Life, but only slight evidence was presented below supporting this assertion.

On March 1, 1983, an agreement entitled an "assumption and reinsurance" agreement was executed at offices in San Rafael, California shared by CP Life, CARE and CPIS. These entities were represented by Milton Cerf, president of CP Life and California Attorney Stephen M. Sirota, secretary of CP Life and vice-president of CARE, while FN Life was represented by its president, Randall Hunter.

Hunter's affidavit opposing summary judgment stated that the agreement, drafted by CP Life and providing for acquisition by FN Life, "was not clear with respect to what to do with insureds . . . who were disabled and eligible for an extension of benefits on the effective date of the agreement, January 1, 1983. I refused to enter into an agreement in which First National Life was required to pay disabled nonpremium paying insureds' medical benefits for conditions occurring during California Pacific's time on the risk. In order to resolve the ambiguity and close the deal, Mr. Sirota went into an office with Milton Cerf, where they prepared an addendum which was signed by Milton Cerf, President of California Pacific. . . ."

The addendum has been set forth in the record. It reads as follows: "FNL agrees to reinsure and assume the Group Insurance Policies discussed in the 'Agreement' subject to the following understanding.

"FNL's claims liability includes coverage of all individuals with current and in-force insurance under the CP Life underwritten policies on the effective date of transfer regardless of whether such persons are (a) actively at work at such date, (b) hospitalized, (c) or subject to any extension of benefit coverages including Dependent Survivors benefits under such C.A.R.E. issued contracts; *however, this clause excludes FNL liability for those receiving or eligible for benefits prior to the effective date of this contract under the Twelve Month Extension of Benefits provision* for which CP Life will remain liable."

With this addendum, FN Life then executed the agreement of "assumption and reinsurance" with CP Life; the effective date was to be retroactive to January 1, 1983. Two other provisions of the agreement as drafted by CP Life are worthy of note.

The agreement provides, in pertinent part, that "Upon execution of this Agreement, FNL shall pay all claims accured (*sic*) under such policies on or after the effective date hereof, and shall maintain the reserves required by the policies and by law. *FNL and CP Life agree that the assumption of such policies by FNL shall work a novation concerning the obligations of CP Life regarding policyholder benefits as defined in such policies.* The assumption by FNL shall relieve CP Life of the liabilities defined in such policies subject to the provisions of this Agreement." (Italics added.)

The agreement also provided for arbitration of any disputes arising from it, but neither insurer invoked the arbitration provisions when this litigation commenced. The agreement also declares that "the parties hereto hereby agree that his (*sic*) contract is made in contemplation of the laws of the State of Alabama." (FN Life's home office is in Montgomery, Alabama.)

After FN Life assertedly assumed liability to Stratton, FN Life issued a new certificate, effective January 1, 1983, to Stratton, showing FN Life as the insurer; plaintiff Stratton continued to pay premiums. At some point, we are told, Stratton converted from the group policy to an individual policy, and continued to pay premiums. As of March 30, 1984, neither CP Life or FN Life were willing to pay Stratton's medical claims. The insurers have made no arrangement to pay Stratton throughout this protracted litigation.

Defendants CP Life and CARE sought summary judgment against plaintiff Stratton and defendant FN Life, claiming that CP Life was insulated

from liability to Stratton by the provisions of Insurance Code sections 10128.2 and 10128.3. Their second line of defense was that the addendum clause excluding certain insureds from their contract with FN Life was not applicable to Stratton, and thus his medical care was FN Life's responsibility.

Opposition to the summary judgment motion was filed by both plaintiff and FN Life. In plaintiff's opposition, included in the record before us, plaintiff asserted that the dispute between the insurers was a simple one, contractual in nature and largely irrelevant because the insurers had negotiated the acquisition by FN Life *without obtaining the consent of the insured plaintiff*. It was plaintiff's position that the March 1, 1983, contract between the insurers was a contract of assignment rather than one of novation (as described in the agreement), and that pursuant to common law contractual principles, both insurers were jointly liable to him as the assignor-assignee of contractual rights to which plaintiff was entitled: the payment of medical benefits.

As indicated, the trial court awarded summary judgment against both plaintiff Stratton and FN Life to defendants CP Life and CARE on both the complaint and the cross-complaint but only FN Life has appealed from the decision of the trial court.

## Issues on Appeal

Since only CP Life and CARE sought summary judgment below, and FN Life's appeal has been taken from the ruling awarding summary judgment to these entities, our appellate review is necessarily concerned only with determining the correctness of the ruling made. The litigation raises numerous legal issues, but the record does not have sufficient factual content to decide most of them.

We deem the issues presented here to be as follows: (1) whether the sections of the Insurance Code relied upon by CP Life and CARE required the trial court to grant them summary judgment; (2) whether there was sufficient evidence presented to the trial court supporting a determination that the addendum clause was *not* intended by the negotiating parties to include plaintiff Stratton; (3) what relief, if any, the plaintiff, as a nonappealing party, is entitled to in this court.

We address these issues seriatim.

DISCUSSION

I.

■ CP Life and CARE relied in the trial court on Insurance Code sections 10128.2 and 10128.3, as they read prior to January 1, 1984. It was their contention that these statutes permitted them to deny responsibility to totally disabled insureds such as Stratton, and placed that responsibility on FN Life as the "successor" or "replacement" carrier.

These Insurance Code provisions mandate the inclusion of extended benefits in group medical policies issued in this state for insureds who become totally disabled during the contractual period of their policy of insurance. The obvious objective of the Legislature is to ensure coverage for these persons as long as possible.

Insurance Code section 10128.1 defines the basic terminology employed in succeeding sections. Section 10128.2, subdivision (d), provides that every policy providing hospital, medical, or surgical benefits shall be deemed to include a reasonable extension of such benefits upon discontinuance of the policy.

Insurance Code section 10128.3, subdivision (a), provides that any carrier providing replacement coverage with respect to hospital, medical or surgical benefits within a period of 60 days *from the date of discontinuance of a prior policy providing such benefits* shall immediately cover all employees who were validly covered under the previous policy at the date of discontinuance.

The 1983 amendments to these provisions *did not change* the basic provisions described above; the amendments were undertaken to clarify the responsibilities of successive insurers after there had been a statutory interpretation placing responsibility for a totally disabled insured on the successor carrier. (*Pacific Mut. Life Ins. Co.* v. *Am. Guar. Life Ins.* (9th Cir. 1984) 722 F.2d 1498.) The 1983 amendment of Insurance Code section 10128.1 defined "discontinuance" of a policy as the "termination of a policy or the termination of coverage" [by] "an entire employer unit." We are mindful that the 1983 amendment stated that the amendment was not to be utilized in interpreting preexisting law (Stats. 1983, ch. 126, p. 299; see Health & Saf. Code, § 1399.61) but we need not utilize it for our purposes here.

These statutes, both prior to and after amendment, tried to close the "gap" that might exist when one group policy *comes to an end and another takes its place*. As is evident by the language employed in these statutes, the

Legislature was addressing a distinctly different problem than the one presented here, where a carrier, CP Life, attempts to unburden itself of a group of policies by a total transfer to another carrier *at mid-risk.*

Nowhere in our record is there the slightest evidence that there was a *discontinuance* of Stratton's policy prior to January 1, 1983—a point conceded by CP Life and CARE on appeal. Under these circumstances, the Insurance Code sections we have set forth in pertinent part above, relied upon by CP Life and CARE below, simply had no application to the case, and we so hold. The trial court should not have granted summary judgment to CP Life and CARE on this basis.

## II.

■■■ In opposing summary judgment, defendant FN Life brought to the trial court's attention the existence of the addendum added to the contract of "assumption and reinsurance" executed by the insurers on March 1, 1983, and submitted the affidavit of FN Life president Hunter, who recited the circumstances under which the addendum was prepared and what he interpreted it to mean.

Nowhere in CP Life and CARE's original papers seeking summary judgment was reference made to the addendum, and at no time during the extended proceedings was any evidence presented by them concerning the actual preparation of the addendum, or what the drafters (officers of CP Life and CARE) intended it to mean. The declarations (and explanatory letters) of Attorney Sirota were never stated in terms of intent, and were confined in large part to irrelevant and inadmissible expressions of Sirota's legal opinions and conclusions about the various matters at issue, most specifically about the definition of terms contained in CARE's "master contract." Even if these expressions were admissible, they lacked consistency.

The pertinent provisions of the addendum are set forth *ante,* and will not be repeated here, but it is uncontroverted by the parties that the description contained therein of the group to be excluded from acquisition by FN Life, i.e., those insureds receiving or eligible for extended benefits pursuant to the "twelve-month" provision, was to be interpreted by reference to the "twelve-month extension" contained in the "master contract" held by CARE. The various legal arguments submitted concerning the addendum by the parties merely emphasize that the "master contract" was ambiguous, and so was the addendum.

Under the "Effective Dates and Termination Dates Section" of the group policy submitted to the court at one point by CP Life and CARE (i.e., the

"specimen" policy) it is provided that "Insurance for the Insured or Insured Dependent will end on the last day of the Contract month following the earliest of the dates below:

"The date the Contract ends; the date he requests that his Insurance ends, but not before CP Life receives this request; the date to which premiums have been paid; the [last] date [of the Contract Month] he ceases to be *eligible* for this insurance; or, the date he enters the Armed Forces of any country." (Italics added.)

It is undisputed that Stratton was *not* receiving benefits pursuant to the "Twelve Month Extension of Benefits" as of December 31, 1982, the end of the contract month. The question of interpretation is whether he was among those insureds referred to in the addendum and the "master policy" as *eligible* for such benefits at any time prior to the effective date of the FNL-CP Life agreement, January 1, 1983.

Unfortunately, nowhere in this policy as far as we have been able to ascertain is there a single, workable definition of what renders an individual eligible for this medical insurance or eligible for the "twelve month extension of benefits"; as may be seen, whether "termination" has occurred depends, in one crucial circumstance, on "eligibility." One reasonable interpretation is that "eligibility" is conditioned on an insured's being actively employed on a full-time basis; if this is so, then Stratton may well have been *subject to* "termination" at the end of December 1982 and arguably *included* in the excluded group contemplated by the addendum agreement.

With respect to "Conditions of Individual Effective Dates," the policy provides that "If the Proposed Insured is not Actively Working Full-Time in his Occupation on the date his Insurance or increase in Benefits under the Contract would otherwise become effective, it will not become effective until the second consecutive day on which he is Actively Working Full-Time in his Occupation."

FN Life contends that this provision governing the *beginning* of "eligibility" also means that persons no longer working actively full time at their occupations—such as Stratton, on December 17, 1982—would no longer have been "eligible" for CP Life's insurance at the end of the month of December 1982. FN Life argues here that Stratton was in fact not "eligible" on the effective date of the agreement, but the question remains whether "eligible" insureds includes those who could be terminated but might not be because of another extension of benefits provision, a six-month extension contained elsewhere in the "master contract."

Whether FN Life's interpretation is reasonable or not, the addendum stated that FN Life was assuming the duties of a reinsurer "regardless of whether such persons are (a) *actively at work at such date* . . ."

The policy provides: "*Extension of Benefits.* If an insured person is totally disabled at the time his insurance *terminates,* benefits will be payable to the same extent as if the insurance had not terminated, for expense incurred on account of the sickness or injury which caused such disability until the earliest of:

"(a) the date the total disability ceases; or

"(b) the date on which coverage for the person effective, with no limitation as to the disabling condition, under any other group policy or medical benefit or service plan written on a group basis; or

"(c) the end of the 12 months following the date his insurance terminated." (Italics added.)

CP Life and CARE ultimately took the position below that for the purpose of interpreting the addendum, plaintiff Stratton's coverage was *never* "terminated" before the end of December 1982 *because the group contract (in which he participated) never terminated*—and thus he could not possibly have been subject to the 12-month extension of benefits. FN Life points out on appeal that if CP Life and CARE's definition of "termination" is accepted, *none* of the insureds presumably referred to in the addendum would have been subject to the 12-month extension of benefits clause, and thus the "exception" supposedly provided for in the addendum would have been meaningless.

■ We note the cardinal, well-established rule of construction of insurance contracts in particular, and of contracts in general, which is that ambiguities are "interpreted most strongly against the party who caused the uncertainty to exist." (Civ. Code, § 1654; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 698, p. 631.) ■ That includes a group policy of medical insurance which does not adequately define basic terms, and an addendum clause, the meaning of which turns on the language of the group policy in question.

The Hunter declaration established without contradiction that CP Life and CARE prepared the addendum; CP Life presumably is responsible for the language of the policy it issues to the public. No intelligible explanation of the intent of the draftsmen was offered by CP Life and CARE as to the

identity of those insureds to whom they intended the addendum clause to apply.

 When extrinsic evidence concerning the meaning of language is offered in the trial court, we uphold any reasonable interpretation of that language adopted by the trial court. While FN Life offered the Hunter declaration, all it established was who drafted the addendum and what Hunter intended it to contain; his statement was also ambiguous. We hold that the addendum was ambiguous, requiring more extrinsic evidence than was presented below, and that there was not sufficient evidence to support the trial court's ruling awarding summary judgment to CP Life and CARE.

## III.

Plaintiff has not appealed from the trial court's ruling. As is explained, however, in 9 Witkin, California Procedure, *supra,* Appeal, section 247, page 252, "[t]he rule that error against a nonappealing party cannot be reviewed . . . is not inflexible. Where portions of a judgment adverse to a nonappealing party are inextricably interwoven with the whole judgment, a general reversal may be ordered to do complete justice."

Plaintiff took the position below that *both* insurers were responsible for the gravamen of his complaint, and that their struggle to avoid responsibility, as it developed in the summary judgment proceedings, was irrelevant. Plaintiff argued that the "assumption and reinsurance" agreement executed by the insurers was meaningless insofar as Stratton's claims were concerned because the insurers had attempted a "novation," i.e., a substitution of insurers, without plaintiff's consent. Plaintiff argued that the agreement was actually an assignment, whereby FN Life assumed some coverage but CP Life could not entirely delegate it. (See 1 Witkin, Summary of Cal. Law, *supra,* Contracts, § 943, p. 841.)

When plaintiff took this position below, CP Life and CARE countered by reference to the "fine print" in the CARE application. Many triable issues of fact are involved in this particular area of dispute; among them are the relationship between CARE and CP Life, the validity of the "fine print," the problem that if the "fine print" is taken literally, conferring a unilateral right on CARE or CP Life to change the terms of the insurance contract, the contract may be illusory.

There is obviously some merit in plaintiff's argument. A recent opinion of the Court of Appeal, dealing with a transfer of policies from one insurer to another, has held that "[i]t simply is not within the power of an insurer, against the consent of the insured, to substitute another insurer in carrying out of its undertaking." (*Baer* v. *Associated Life Ins. Co.* (1988) 202 Cal.App.3d 117, 124 [248 Cal.Rptr. 236].) It has been said that "[e]xcept as otherwise provided by statute or principles of public policy, insurance contracts are regarded in the same light as ordinary business contracts between individuals and are subject to the same general principles of construction." (13 Appleman on *Insurance Law and Practice* (1976) § 7381, p. 1.) A 1937 decision of the California Supreme Court, *Sawyer* v. *Sunset Mutual Life Ins. Co.* (1937) 8 Cal.2d 492 [66 P.2d 641], held successive insurers *jointly liable* to pay the claim of the insured.

Insurance Code section 620 provides that "A contract of reinsurance is one by which an insurer procures a third person to insure him against loss or liability by reason of such original insurance." A contract of reinsurance does not contemplate the substitution of one party for another, but rather a spreading of the risk already assumed by the procuring insurer.

We discuss plaintiff's position to demonstrate that the summary judgment awarded CP Life and CARE against plaintiff is "inextricably interwoven" with the outcome of FN Life's appeal. We therefore reverse the summary judgment entered below against plaintiff, as well as FN Life.

When this matter returns to the trial court, it would seem that numerous additional facts need to be developed there in order to properly resolve this matter or make a record suitable for appellate review. Of particular importance is the ultimate characterization of a system of administering an insurance plan involving the insured, his employer, an employer organization created by the insurer, and the insurer. That may determine some issues of agency, fiduciary responsibility, waiver and estoppel. (See 1 Appleman, *supra,* § 41 commencing with p. 83 for a discussion of the distinctions that have been made between group medical insurance and "franchise" insurance.)

## DISPOSITION

The summary judgment awarded CP Life and CARE against plaintiff Stratton and FN Life is reversed. FN Life to recover costs on appeal.

Spencer, P. J., and Devich, J., concurred.