[No. B101370. Second Dist., Div. One. Apr. 29, 1997.]

ANTONIO SALAZAR et al., Plaintiffs and Appellants, v.
SOUTHERN CALIFORNIA GAS COMPANY, Defendant and Appellant.

COUNSEL

Michael J. Piuze and John Keiser for Plaintiffs and Appellants.

Woodrow D. Smith, Melvin L. King and Robin C. Chow for Defendant and Appellant.

OPINION

SPENCER, P. J.—

### INTRODUCTION

Plaintiffs Antonio Salazar, his wife Maria Salazar, and their children, Omar, Cesar, Henry, Sonia, Carla, Mayra and Lillian Salazar, appeal from a summary judgment in favor of defendant Southern California Gas Company. Defendant also appeals from the summary judgment insofar as the trial court found plaintiffs' action was not barred by the statute of limitations.

### STATEMENT OF FACTS

On January 20, 1992, plaintiff Antonio Salazar (hereafter plaintiff) was burned in a flash fire. He was working in his garage, spraying metal parts with a spray can of carburetor cleaner; an open, five-gallon can of gasoline was next to him. He was standing approximately four feet from a water heater, which was located in the garage. The fire occurred when vapors from the carburetor cleaner or gasoline were ignited by the pilot light on the water heater.

Plaintiff rented the garage and a guest house, in Sun Valley, from their owner, Kenneth Battson (Battson). Battson had installed the water heater

about 10 years earlier. It was elevated only two to three inches off the floor of the garage. Plaintiff was aware of its elevation and the fact it had a pilot light.

In 1968, the Los Angeles Municipal Code was amended to require that water heaters in residential garages be elevated at least 24 inches above the floor; in 1988, the required elevation was lowered to 18 inches. The purpose of the elevation requirement is to reduce the possibility the pilot light on the water heater will ignite flammable liquids or vapors in the garage. These vapors tend to be heavier than air and stay close to the ground unless disturbed by air currents or movement.

According to defendant, there were two warning labels on the water heater. One, placed there by the manufacturer and printed in red, contained a warning not to store or use flammable liquids near the water heater. The second, placed there by defendant, also contained a warning in red that flammable liquids should not be stored or used near the water heater. Plaintiff did not recall the warning labels but stated that, if the labels were there, he would have been unable to understand them.

For purposes of the summary judgment motion, defendant was willing to assume that on two occasions prior to the fire, at Maria Salazar's request, defendant sent service people over to inspect the water heater, once before plaintiffs moved into the house and once when Maria Salazar smelled gas in the kitchen and heard noises coming from the water heater. The service people observed the water heater but did not issue a notice of unsatisfactory condition regarding the water heater's lack of elevation.

For many years, defendant has had a policy for goodwill purposes of informing its customers regarding conservation and safety measures with respect to gas appliances. This included warning its residential customers not to store or use flammable liquids or vapors near gas appliances. From late 1977 through late 1983, defendant instructed its service people to place stickers on water heaters warning customers not to store or use combustible material or flammable liquids near the appliance. Defendant also instructed its service people to provide new customers with a booklet which contained a similar warning.

In December 1989, defendant adopted an internal policy under which service people were instructed to issue warning notices to customers if they observed unelevated water heaters in residential garages. The policy was adopted as a matter of goodwill, in furtherance of defendant's practice of giving its customers safety and conservation tips regarding the use of gas

appliances. A company bulletin identified a "[w]ater heater located in a garage, carport or area where flammable vapors and liquids or combustible material may be stored and the water heater is not elevated at least eighteen (18) inches above the floor level" as a potential hazard. Service people were instructed to provide customers with written notice of unsatisfactory conditions, explaining that elevation of the water heater would reduce the risk of flammable vapors being ignited.

However, defendant never contracted with its customers to assume the risk of liability for loss or injury caused by a fire, where an unelevated water heater in a residential garage was involved in the fire and defendant's service people failed to issue a warning notice regarding the water heater.

## CONTENTIONS

*On Appeal*

### I

Plaintiffs contend defendant's duties existed, in that it supplied an inherently dangerous substance.

### II

Plaintiffs further contend defendant created a hidden danger by supplying gas to a hazardous appliance and therefore had a duty to warn of the danger or disconnect service.

*On Cross-appeal*

### III

Defendant asserts the trial court erred in denying it summary judgment based on the statute of limitations.

## DISCUSSION

*On Appeal*

### I

Plaintiffs contend defendant's duties existed, in that it supplied an inherently dangerous substance. We disagree.

Summary judgment properly is granted if the "affidavits, declarations, admissions, answers to interrogatories, depositions, and matters of which

judicial notice shall or may be taken" in support of and in opposition to the motion "show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subds. (b), (c).) ■ Summary judgment is a drastic procedure, inasmuch as it denies the right of the opposing party to trial, and it thus should be used with caution. (*Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 35 [210 Cal.Rptr. 762, 694 P.2d 1134].) Therefore, the moving party's papers are strictly construed, accepting as fact only those portions not contradicted by opposing papers, while the opposing party's papers are liberally construed, all facts therein being accepted as true. (*Kelleher* v. *Empresa Hondurena de Vapores, S.A.* (1976) 57 Cal.App.3d 52, 56 [129 Cal.Rptr. 32].)

When it is the defendant who moves for summary judgment, summary judgment is proper if the defendant either proves an affirmative defense or disproves at least one essential element of the plaintiff's cause of action (*Chevron U.S.A., Inc.* v. *Superior Court* (1992) 4 Cal.App.4th 544, 548 [5 Cal.Rptr.2d 674]; *Brunelle* v. *Signore* (1989) 215 Cal.App.3d 122, 127 [263 Cal.Rptr. 415]), or if the defendant shows that an element of the cause of action cannot be established (see *Gribin Von Dyl & Associates, Inc.* v. *Kovalsky* (1986) 185 Cal.App.3d 653, 663 [230 Cal.Rptr. 50]). (Code Civ. Proc., § 437c, subd. (o)(2).) The defendant "must show that under no possible hypothesis within the reasonable purview of the allegations of the complaint is there a material question of fact which requires examination by trial." (*Chevron U.S.A., Inc.*, *supra*, at p. 548.) Only if the defendant makes the requisite showing does the court need to examine the plaintiff's opposing papers to determine if they demonstrate the existence of a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (o)(2); *Chevron U.S.A., Inc.*, *supra*, at p. 548; *Perkins* v. *Howard* (1991) 232 Cal.App.3d 708, 712 [283 Cal.Rptr. 764].)

■ Although the trial court may grant summary judgment on one basis, this court may affirm the judgment under another. On appeal, this court examines the facts and independently determines their effect as a matter of law. (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal. App.3d 1061, 1064-1065 [225 Cal.Rptr. 203]; *Bonus-Built, Inc.* v. *United Grocers, Ltd.* (1982) 136 Cal.App.3d 429, 442 [186 Cal.Rptr. 357].) It is not bound by the trial court's stated reasons, if any, supporting its ruling; it reviews the ruling, not the rationale. (*Stratton* v. *First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071, 1087 [258 Cal.Rptr. 721].)

■ Plaintiffs contend defendant owed them a duty based on its supplying an inherently hazardous substance to them—natural gas. In support of this contention, plaintiffs rely on *Ambriz* v. *Petrolane Ltd.* (1957) 49 Cal.2d 470 [319 P.2d 1].

In *Ambriz*, the plaintiffs moved into a cabin which had outlets for butane gas. The defendant filled the butane gas tank but did not check the outlets for leaks. There was a leak, which allowed gas to escape into the cabin. As a result of the gas leak, an explosion and fire occurred. (*Ambriz* v. *Petrolane Ltd.*, *supra*, 49 Cal.2d at p. 474.)

The court concluded it was "clear that butane gas, like natural gas or electricity, is an inherently and highly dangerous commodity. In view of the inherently dangerous nature of this commodity a high degree of care is required in handling it." (*Ambriz* v. *Petrolane Ltd.*, *supra*, 49 Cal.2d at p. 477.) However, this high degree of care does not place on a gas company an unlimited duty of care.

As a general rule, a gas company which does not install or maintain gas lines in its customer's premises and is not responsible for their maintenance is not liable for injuries caused by leaks in the lines of which it has no knowledge. (*Ambriz* v. *Petrolane Ltd.*, *supra*, 49 Cal.2d at p. 478.) Under certain circumstances, however, the gas company may have a duty to inspect the gas lines and/or refuse to supply gas through unsafe lines. (*Ibid.*)

" 'If a gas company knows, at the time it turns on the gas, or, after turning on the gas, becomes aware, that there are defects in the pipes, or if the company is in possession of facts that would suggest to a person of ordinary care and prudence that the pipes in the building are leaking or are otherwise unsafe for the transportation of gas, the company is under a duty to make such an inspection or investigation as a person of ordinary care and prudence, similarly situated and handling such dangerous agency, would make to ascertain the safety of the pipes, before it furnishes or continues to furnish gas through them. If the gas company fails to do this and furnishes or continues to furnish gas through the pipes, it does so at its own risk and becomes liable for an injury resulting therefrom to any person in the building who is without fault. Similarly, a gas company knowing that the service line, which it is under no duty to repair or maintain, is rusted and corroded to such an extent as to permit gas to escape must cause the line to be repaired by the person whose duty it is to do so or must shut off the gas at the street.' [Citation.]" (*Ambriz* v. *Petrolane Ltd.*, *supra*, 49 Cal.2d at p. 478.)

Once the gas is turned on, the gas company has no duty to inspect the customer's gas lines absent notice of a leak in those lines. (*Ambriz* v. *Petrolane Ltd.*, *supra*, 49 Cal.2d at p. 479.) But before turning the gas on, the gas company must make sure the gas lines are safe. (*Ibid.*) " 'Gas companies, as manufacturers and distributors of a highly explosive and inflammable substance, possess technical knowledge of the dangers to be guarded against

in handling or installing gas appliances for illuminating and commercial purposes far beyond the knowledge possessed by the average person. It would appear to be the duty of a gas company to make some inquiry or investigation to satisfy itself that all openings in the house pipes are closed at the time it turns on its meters.' [Citation.]" (*Id.* at pp. 479-480.)

In the case before the court, the court concluded the evidence supported a finding of liability on the part of the defendant gas company. (*Ambriz* v. *Petrolane Ltd., supra*, 49 Cal.2d at p. 480.) It had a duty to make sure the gas lines were safe before supplying gas to the cabin; it should have known the valves on the gas lines in the cabin were insufficient; and it knew of the dangerous nature of the gas it was supplying. Under these circumstances, it was negligent in filling the gas tank. (*Ibid.*)

In the instant case, unlike *Ambriz*, it was not the inherently dangerous gas *supplied by defendant* which caused the explosion. There were no defective gas lines or valves which caused that gas to leak, leading to the explosion and fire. Defendant did not breach any duty of care with respect to the product it supplied to plaintiffs. Accordingly, *Ambriz* does not support imposition of liability on defendant under the circumstances of this case.

## II

Plaintiffs further contend defendant created a hidden danger by supplying gas to a hazardous appliance and therefore had a duty to warn of the danger or disconnect service. Again, we disagree.

The trial court found the water heater was not dangerous or defective. It had been in use without incident for 10 years prior to the explosion and fire. The water heater had been installed in a manner which might be hazardous if someone were using or storing flammable liquids nearby. But this fact alone was insufficient to impose upon defendant the duty to warn plaintiffs of the potential hazard; no existing case law imposed such a duty on defendant.

*Ambriz* v. *Petrolane Ltd., supra*, 49 Cal.2d 470 does not impose such a duty on defendant. It imposes a duty only to make sure the lines carrying the gas to the customer's premises are safe. (At pp. 478-480.) Even if this duty could be extended to appliances, it would extend only so far as a duty to ensure that the appliances were not in such a condition as to render them unsafe to supply gas to them, i.e., the mere supply of gas to the appliances would not create a danger of explosion or fire. The focus of *Ambriz* is the safety of the process of the gas company's supply of gas to the customer.

Plaintiffs rely on a number of foreign cases in support of their contention defendant had a duty to warn them of the danger or disconnect their gas service due to its creation of a hidden danger. None of them supports the extension of a duty to warn to the instant case, where neither the gas lines nor the appliance created an immediate danger if supplied with gas and not acted upon by an outside agency.

*Claxton Poultry Co., Inc.* v. *City of Claxton* (1980) 155 Ga.App. 308 [271 S.E.2d 227] states the general rule that ". . . the company which merely furnishes gas for appliances on private property owned and controlled by the owner or occupant of the premises, is not liable to the owner or occupant or to third persons on the premises for injuries caused by defective conditions in the gas appliances. An exception thereto [exists] if the gas is supplied with actual knowledge on the part of one supplying it of the defective and dangerous condition of the customer's appliances, [and in that case the supplier] is liable for injuries caused by the use of such defective and dangerous appliances[. B]ut generally if the utility has no control over the appliances and has no actual knowledge of the defective and dangerous condition thereof its responsibility ends when connection is properly made under proper conditions and the gas is delivered in a manner which will protect both life and property." (271 S.E.2d at p. 235.)

Pursuant to the foregoing rules, the plaintiffs in *Claxton* wanted the jury instructed that the mere fact a gas appliance was owned or controlled by a property owner does not free a gas supplier from liability for creating a dangerous condition with reference to the appliance. (*Claxton Poultry Co., Inc.* v. *City of Claxton, supra*, 271 S.E.2d at p. 235.) The court noted that the plaintiffs' case was based upon claims the gas supplier improperly handled the pressure of the gas supplied, a filter or separator did not work, and the gas was contaminated with debris. As a result of the foregoing, debris entered the gas lines inside the plaintiffs' plant, causing regulators to malfunction. This in turn led to a rupture and explosion. (*Id.* at p. 236.) Under these facts, the supplier could be held liable, even though the malfunctioning regulator belonged to the plaintiffs; therefore, the plaintiffs were entitled to the instruction. (*Ibid.*)

The foregoing has no application to the instant case, where it was not defendants' gas acting on plaintiffs' water heater which caused the explosion and fire. Plaintiffs' water heater was not defective and dangerous in the same way the appliances were in *Claxton*: Gas could be supplied to the water heater without risk the water heater itself would malfunction and cause an explosion and fire.

*Lemke* v. *Metropolitan Utilities Dist.* (1993) 243 Neb. 633 [502 N.W.2d 80, 92] imposed a duty on a government utility to warn its customers about

a defective connector to gas appliances; the defective connector could cause a gas leak. The duty imposed was no greater than that in *Ambriz*, extending only to gas lines inside the customers' premises. *Halliburton* v. *Public Service Co.* (Colo.Ct.App. 1990) 804 P.2d 213 also involved defective connectors. *Ruberg* v. *Skelly Oil Co.* (Minn. 1980) 297 N.W.2d 746, *Wilson Gas Utilities Corporation* v. *Baker* (1939) 276 Ky. 368 [124 S.W.2d 489] and *Baker* v. *Kansas Power & Light Co.* (1937) 146 Kan. 258 [69 P.2d 731] involved defective gas lines.

In *Kilmer* v. *Browning* (Mo.Ct.App. 1991) 806 S.W.2d 75, the gas company inspected the furnace and venting system before turning on the gas. There was evidence it failed to discover deterioration in the venting system; due to the deterioration carbon monoxide leaked into the residences served by the furnace, and a resident died of carbon monoxide poisoning. (At pp. 78, 82.) The court held the jury properly was instructed that the gas company could be held liable for failing to adequately inspect the furnace and venting system, thereby supplying gas to an unsafe furnace. (*Id.* at pp. 83-85.) *Reed* v. *Smith Lbr. Co.* (1980) 165 W.Va. 415 [268 S.E.2d 70] also involved a defective furnace and venting system—the furnace was installed backwards and not vented properly, but the gas company nonetheless turned on the gas. In *Acosta* v. *Zito* (1985) 114 A.D.2d 757 [494 N.Y.S.2d 711], the gas company was held liable for turning on the gas despite knowing that plaintiff's stove was not working properly, resulting in the stove's exploding. As in *Claxton*, the gas appliances themselves were unsafe when supplied with gas. This is not the case here.

The only case cited by plaintiffs involving a fact situation similar to the one in the instant case is *Harris* v. *Northwest Natural Gas Co.* (1978) 284 Or. 571 [588 P.2d 18]. In *Harris*, the defendant turned on the gas at the plaintiff's residence and lit the pilot lights on his water heater and furnace, which were located in his garage. Later, gasoline vapors in the garage were ignited by the pilot lights, and the plaintiff was injured. (588 P.2d at p. 20.) The court rejected the plaintiff's claim defendant was strictly liable for his injury based on its supplying an unreasonably dangerous product in a defective condition to him. The defendant's product—the gas—was not defective; if anything was defective, it was the design of the appliances. Additionally, the relationship between the unreasonable danger to the plaintiff caused by gasoline fumes coming in contact with the pilot lights and the defendant's product was too attenuated and remote. (*Id.* at pp. 21-22.) The court did state, however, without any citation to authority, that the plaintiff could state a cause of action for negligence for failure to warn him of the danger that the pilot lights could ignite volatile substances in the garage. (*Id.* at p. 23.)

Defendant also was able to find a case involving a similar fact situation; in this case, no duty to warn was imposed. In *Giordano* v. *Rheem Mfg. Co.* (La.Ct.App. 1994) 643 So.2d 492, a gas company representative went to the plaintiffs' home to turn on the gas. At the plaintiffs' request, he went to a storage room at the rear of the carport where the water heater was located. The water heater was unelevated. He noticed no flammable substances stored in the vicinity of the water heater. He either told the plaintiffs how to light the water heater, or he told the plaintiffs something was wrong with the pilot light and they should have it repaired by a plumber, then disconnected the gas to the water heater. Eventually, the pilot light was lit. The plaintiffs stored a gasoline powered lawn mower and a gas tank in the storage room. Seven months after the gas was turned on, flammable vapors were ignited by the water heater's pilot light, causing a fire. (At pp. 494-495.)

The court concluded there were no flammable substances stored in the storage room when the gas was turned on sufficient to put the gas company representative "on notice of a defective or dangerous condition." (*Giordano* v. *Rheem Mfg. Co., supra*, 643 So.2d at p. 497.) Under the circumstances, the representative had no duty to warn the plaintiffs of "hazardous conditions relating to the storage of flammable substances in close proximity to the hot water heater. The accident, which occurred nearly seven months later, was not in any way related to [the representative's] presence at [the plaintiffs'] home . . . for purposes of turning on natural gas service." (*Ibid.*) Therefore, the gas company owed and breached no duty to the plaintiffs. (See *ibid.*)

There is, as the trial court found, no California authority requiring the imposition of a duty on defendant to warn plaintiffs of the potential dangers of an unelevated water heater under the facts of the instant case. The question, then, is whether this court should impose such a duty.

The concept of duty is an expression of policy considerations which lead the courts to say that the plaintiff is entitled to the defendant's protection. (*Peterson* v. *San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 805-806 [205 Cal.Rptr. 842, 685 P.2d 1193].) A number of factors go into the determination whether a duty exists, including " ' "[t]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. [Citations.]" ' [Citations.]" (*Id.* at p. 806.)

It is undisputed that harm from a gas-fired water heater when flammable substances are stored or used nearby is foreseeable. What is not

foreseeable, however, is that the harm is more likely if the water heater is not elevated. Additionally, the number of incidents involving gas-fired water heaters and flammable liquid vapors is small compared with the number of gas-fired water heaters in use.

The briefing package for gas-fired water heater ignition of flammable vapors prepared for the Consumer Products Safety Commission (CPSC) in 1994 (CPSC Briefing Package), of which plaintiffs have requested we take judicial notice, states in its summary that "[g]as-fired water heaters igniting flammable vapors cause an estimated 1,961 fires each year, resulting in an estimated 316 injuries, 17 deaths, and $26 million in property damage for a total societal cost which may be as high as $395 million. Typically, injuries occur when the victim is using flammable liquids (usually gasoline) for cleaning purposes, or when the liquid leaks or is accidentally spilled near the water heater. . . . [R]aising water heaters 18 [inches] can significantly reduce the risk of vapor ignition."

According to the December 15, 1994, statement of CPSC Vice Chairman Mary Sheila Gall, of which defendant has requested we take judicial notice, only 3 percent of all fires involve flammable vapors and only 5 percent of these involve gas-fired water heaters. Thus, the estimated 1,961 fires each year involving flammable liquids and water heaters represent less than 1 percent of all fires. The majority of these are caused by improper storage or use of gasoline. The problem, in her view, "is one of consumer behavior rather than a defective product."

According to a flammable vapor ignition hazards study prepared by Arthur D. Little for the Gas Appliance Manufacturers Association (GAMA Study), of which defendant has requested we take judicial notice, the number of incidents of water heater ignition of flammable vapors among defendant's customers from 1987 to 1992 averaged 2.1 per million water heaters. No distinction was made between elevated and unelevated water heaters.

The GAMA Study also reported on fires in Oregon, which since 1976 has had a strictly enforced state building code requiring that gas-fired water heaters located in garages be elevated 18 inches above the floor. The incident rate for gas-fired water heaters igniting flammable vapors was 43.2 per million, well above the national average. From 1987 to 1991, an average of 37 percent of these fires occurred in garages, despite the 18-inch elevation requirement.

According to the GAMA Study, in California, since 1974, when individual counties and cities began adopting codes requiring elevated water heaters

in garages, the rate of incidents involving gas-fired water heaters igniting flammable vapors had dropped to one-third its previous level. However, there was also a decrease in all incidents involving flammable liquids and water heaters and non-garage fires, so the decrease could not be completely related to the elevation requirements.

In a November 22, 1994, statement to the chairman of the CPSC by the GAMA water heater division, of which defendant has requested that we take judicial notice, it was noted that Arthur D. Little "evaluated the 18-inch stand [for water heaters] and determined that such a stand would delay, but not eliminate, ignition. Unfortunately, A.D. Little's tests [also] indicated that the stand could create a fire of greater intensity with potential for a greater destruction of property and more serious injury."

In other words, there is no certain connection between elevation of gas-fired water heaters in garages and a decrease in the incidence of fires caused by vapors from flammable liquids coming into contact with the water heaters. Despite the belief that elevating water heaters will decrease the incidence of such fires, this has not been shown to be the case. Additionally, elevating water heaters could cause greater injuries and destruction. Thus, it is not foreseeable that warning customers of the dangers of unelevated gas-fired water heaters and/or requiring that such heaters be elevated for gas service to be continued would decrease the risk of fire caused by ignition of flammable vapors by the water heaters' pilot lights or would decrease the amount of harm from such fires.

Plaintiffs next argue there is a close connection between defendant's conduct and plaintiff Antonio Salazar's injury, and there is significant moral blame attached to defendant's conduct, based on defendant's "*absolute control* over the natural gas supplied to the residence and any unsafe condition" and its failure to take any steps to correct the unsafe condition or prevent plaintiff's injury. (Italics in the original.) However, as previously discussed, any lack of safety was not in the supplying of natural gas to plaintiffs' residence, over which defendant had absolute control. The alleged lack of safety was in the positioning of the water heater, for which defendant was not responsible. There also was a lack of safety in plaintiff Antonio Salazar's use of flammable liquids near the water heater, over which defendant had *no control.*

If, indeed, there were two warning labels on the water heater, one of which was placed there by defendant, this conduct was not sufficient to prevent plaintiff's injury. Even if defendant had issued a notice of unsatisfactory condition, this, by itself, could not have prevented the injury. Additional precautions by Battson and/or plaintiff were required to prevent it.

Only by shutting off entirely the gas to plaintiffs' residence could defendant have prevented the injury. Inasmuch as the water heater had been used for 10 years without incident and defendant was unaware of any immediate potential for harm, i.e., flammable liquids being stored or used near the water heater, shutting off plaintiffs' gas would seem to be unnecessarily drastic. Thus, there is not a close connection between defendant's conduct and plaintiff's injury, and there can be little moral blame attached to defendant's conduct.

Because of the uncertainty as to whether elevating gas-fired water heaters in garages will decrease the incidence of fires caused by vapors from flammable liquids coming into contact with the water heaters, the policy of preventing future harm would not be best served by requiring defendant to warn its customers of the potential dangers of unelevated gas-fired water heaters or disconnecting service to those who have them in their garages. Indeed, if the warning focuses on the elevation of the water heaters rather than on the storage or use of flammable liquids, the incidence of fires could increase, rather than decrease, as people who elevate their water heaters are lulled into a false sense of security as to the safety of the elevated water heaters.

The policy of preventing future harm would better be served by educating the public as to the hazards of storing or using flammable liquids in close proximity to gas-fired appliances or by modifying such appliances to minimize or reduce the risk of igniting flammable vapors. This policy is being met in several ways.

The CPSC Briefing Package summary notes the "CPSC staff's position is that the only adequate way to address the hazard is through a performance standard that leads to water heater design modification," either by developing a performance standard itself or by working with manufacturers to develop a performance standard. CPSC Vice Chairman Mary Sheila Gall's December 15, 1994, statement indicates she would be directing her staff "to work with the gas water heater industry to develop a voluntary standard relating to the ignition of flammable vapors." Additionally, the "[i]ndustry undertook an information and education campaign concerning the dangers posed by flammable vapors when exposed to open flames. This far-reaching effort, which has involved . . . diverse groups such as plumbers and teachers and played on radio and television, has been held up by the Commission staff as an example of a model information and education program. This program recognizes and seeks to attack the heart of this danger: the improper storage and use of gasoline."

Defendant, also, has taken it upon itself to educate the public as to the dangers of storing or using flammable liquids near gas-fired appliances. It

provides its new customers with a warning about these dangers. Warnings such as those provided by defendant and the GAMA will go farther in preventing harm than mere warning of the potential danger of unelevated gas-fired water heaters in garages or requiring that such water heaters be elevated; eliminating the storage and use of flammable liquids near gas-fired water heaters will eliminate fires caused by the vapors from these liquids coming in contact with the heaters' pilot lights, while elevating the water heaters alone may not eliminate fires.

Plaintiffs would have this court place a duty on defendant to warn customers of the dangers of storing or using flammable liquids near unelevated gas-fired water heaters in garages when it becomes aware that its customers have such water heaters, and a duty to disconnect gas service if the customers fail to elevate the water heaters after receiving the warning. Placing such duties on defendant, with resultant liability for breach causing injury, could impose significant costs on society. First, it will require that those with unelevated gas-fired water heaters in their garages of which defendant becomes aware either elevate the water heaters or lose their gas service. Second, it could result in fires of greater severity and cost. Finally, if liability is imposed on defendant, the cost of that liability will be borne by defendant's customers. There is no evidence as to the availability or cost of insurance to cover such liability and, again, the cost of the insurance would be borne by defendant's customers.

An analysis of the appropriate factors suggests a duty should not be imposed on defendant to warn its customers of the potential dangers of an unelevated gas-fired water heater in a garage when it learns that its customer has such a water heater and to disconnect the customer's gas service if the customer fails to heed the warning and elevate the water heater. This conclusion is especially true in light of the uncertainty as to whether elevating gas-fired water heaters in garages will actually decrease the risk of fire caused by exposure to flammable vapors. Accordingly, the trial court was correct in declining to impose such a duty on defendant and granting summary judgment on that basis.

*On Cross-appeal*

## III

Defendant asserts the trial court erred in denying it summary judgment based on the statute of limitations. In light of the conclusion reached above, that the trial court properly granted defendant's summary judgment motion, we need not address defendant's assertion.

The judgment is affirmed.

Ortega, J., and Vogel (Miriam A.), J., concurred.

The petition of plaintiffs and appellants for review by the Supreme Court was denied July 23, 1997.