Filed 8/26/21  Jogani v. Jogani CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| SHAILESH JOGANI, | B302360 |
| Plaintiff and Appellant, | Los Angeles County Super. Ct. No. BC564146 |
| v. | |
| HARESH JOGANI et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark V. Mooney, Judge.  Affirmed.

Ecoff Campain & Tilles, Lawrence C. Ecoff and Alberto J. Campain for Plaintiff and Appellant.

Horvitz & Levy, Jason R. Litt, Rebecca G. Powell; The Cameron Law Firm and Parry G. Cameron for Defendants and Respondents.

—————————————

## INTRODUCTION

Shailesh Jogani appeals from the judgment entered in favor of his brother Haresh Jogani and the entities[1] he formed to amass a billion-dollar California real estate portfolio. Shailesh alleged Haresh and their two younger brothers entered an oral partnership agreement in 1995 to pool their funds from their various businesses to enable Haresh to purchase a portfolio of properties for their collective benefit.[2]

In 2003, their older brother Shashikant (Shashi) sued them claiming a 50 percent partnership interest in the real estate portfolio that he had helped create for the brothers' partnership (Shashi action). The brothers allegedly had purchased Shashi's underwater properties to help him. Allegedly at Haresh's direction, Shailesh and his brothers filed declarations in the Shashi action denying the existence of any partnership with Shashi or Haresh. Haresh nevertheless allegedly told them he would distribute the proceeds from the partnership's real estate portfolio after the Shashi action resolved. The Shashi action continued, and Shailesh finally sued Haresh and his companies in November 2014. He claimed he was owed $250,000,000.

---

[1]    Shailesh also sued J.K. Properties, Inc., H.K. Realty, Inc., Commonwealth Investments, Inc., Mooreport Holdings Limited, and Gilu Investments Limited (defendant companies or Haresh's companies). They and Haresh (defendants) are joint respondents on appeal.

[2]    We have followed the parties' lead and refer to the five Jogani brothers by their first names for clarity. We intend no disrespect by doing so.

Defendants asserted Shailesh's claims were barred by the statute of limitations.  After a jury agreed, the court entered judgment in favor of Haresh and his companies.  Shailesh contends the judgment must be reversed on three grounds: (1) the special verdict form was fatally defective because it did not ask the jury to make specific findings on all material facts required to resolve defendants' statute of limitations defense; (2) the trial court improperly excluded audio recordings of Haresh admitting to the partnership and to pay its proceeds after the Shashi action ended; and (3) the trial court erroneously sustained defendants' demurrer to Shailesh's fraud cause of action.  Finding no prejudicial error, we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

The five Jogani brothers, from oldest to youngest, are: Shashi, Shailesh, Haresh, Rajesh, and Chetan.  They were born and raised in India and speak Gujarati.  Shailesh does not understand or speak English.[3]

### 1. *The Jogani brothers' businesses*

The Jogani brothers' father wanted his sons to act as partners throughout their lives, sharing the proceeds of their business ventures with each other.  As each brother came of age, he learned the diamond business.  In the early 1970s, Shailesh and Haresh, who were in their early twenties at the time, formed the diamond company Dialust.  They had a written partnership agreement.  Shailesh testified Dialust was part of the brothers' " 'global partnership.' "

Shashi was neither interested in the diamond business nor in partnering with his brothers in a global business venture.

_____

[3]     During the trial, Gujarati interpreters interpreted for Shailesh and sometimes for Rajesh and Chetan.  Haresh testified in English, but an interpreter was there if needed.

3

He let his brothers know he wanted any money he made to be his alone, and he moved to the United States where he invested in California residential real estate.[4]

In the meantime, Rajesh and Chetan also learned the diamond business. At some point Rajesh joined Shailesh and Haresh at Dialust. Haresh retired from Dialust in 1978; his name was removed from the written agreement. He then moved to Israel and started the diamond company Jogdiam Israel. Chetan trained with Haresh in Israel between 1982 and 1986 and then moved to Belgium to start Jogdiam Belgium BVBA, and Shailesh and Rajesh stayed in India to run Dialust.

Shailesh, Rajesh, and Chetan testified the four brothers ran their separate companies as a global family partnership, sharing the profits among them.[5] Haresh testified there was no global partnership—the brothers ran their companies separately and did not share profits.

2.    *Formation of the alleged real estate partnership*

In the early 1990s, Shashi began experiencing financial difficulties—his properties were overleveraged and the economy had slowed down. After one of Shashi's apartment buildings collapsed during the 1994 Northridge earthquake, he was on the verge of financial ruin. Shashi traveled to India to ask his family for help. His brothers agreed to help him.

In spring 1995, Haresh and Rajesh met with Shashi in Los Angeles and discussed investing in the California real estate

---

[4]    Accordingly, we exclude Shashi when we refer to the brothers or their partnership/businesses.

[5]    They testified the brothers directed the income from their separate global businesses to Jogdiam Israel through various sub-accounts to take advantage of Israel's favorable tax laws. Haresh handled those accounts.

4

market.  Shailesh (and his brothers) testified Haresh and Rajesh reached an agreement on behalf of the four brothers to invest in the California real estate market with Shashi:  Shashi would hold a 50 percent interest in the real estate portfolio and the four brothers would collectively hold the other 50 percent interest.[6] Under the four brothers' alleged oral partnership agreement, Haresh would invest profits from the brothers' global businesses to purchase apartment buildings through the defendant companies.  Haresh was the sole shareholder and/or director of the companies, but they allegedly held "nominal" title to the properties for the collective benefit of, and as agents for, the four brothers.

Under their alleged agreement, Haresh managed and controlled the vast real estate portfolio on the brothers' behalf. Shashi recommended the properties Haresh's companies should purchase.[7]  Shailesh's son Pinkal went to California around 1996 or 1997 to work for the defendant companies and learn the "family" real estate business from his uncle Shashi. Around 1998, they started a property management company that Haresh's companies hired to manage their real estate portfolio. Pinkal also formed a real estate acquisition company with financial backing from Haresh.  Pinkal understood his company to be part of the family business.

Beginning around 2003, Haresh's son Jeet started to work for Haresh's companies, too; Pinkal and others trained him.  Jeet ultimately became the asset manager for the real estate portfolio.

---

[6]    Shailesh testified partnerships are "done orally" in India "according to Hindu law."  Chetan testified similarly.

[7]    Haresh testified he paid Shashi as a consultant; Shashi had no ownership interest in the real estate portfolio.

5

Pinkal's property management services were terminated in December 2012.

Haresh testified there was no oral partnership agreement among the four brothers or with Shashi relating to his real estate business. Haresh said he started the California real estate business himself—the defendant companies were his "babies." He provided the capital—through his businesses and bank loans—to purchase the properties.

### 3.     *The brothers' meetings*

Shailesh, Rajesh, Chetan, and Pinkal[8] testified the four brothers met twice a year in India over several days to discuss the status of their global business ventures, including the performance of the California real estate portfolio. During their meetings, each brother would circulate financial documents about their respective businesses. After reviewing the financial reports for each brother's business, the brothers would decide where to invest their profits. The real estate business was very profitable. The brothers agreed to reinvest the profits from their companies into the stock market and to build the real estate portfolio. They did not discuss distributing the profits made through the real estate portfolio or their global partnership.

Haresh testified the brothers talked about their businesses generally with each other when their families met in India and all stayed together, in Rajesh's words, "under one roof." They ran their businesses separately; there was no global family partnership or partnership in the California real estate.

### 4.     *The Shashi action*

In February 2003, Shashi sued the four brothers, the defendant companies, and others in the Los Angeles Superior

---

8     Pinkal participated in the real estate discussions.

Court.  He alleged he was entitled to 50 percent of the value of the California real estate portfolio.  Haresh contended Shashi was a mere consultant and not entitled to anything.

According to the three brothers, when they were all together in India in 2003, Haresh told them Shashi had sued them and that he would handle the lawsuit.  Haresh allegedly told the brothers he wanted to teach Shashi a lesson and would give him his share of the real estate partnership after the case was over.

In 2004, Haresh allegedly demanded the brothers sign declarations disavowing the existence of any real estate partnership and denying any ownership interest in the defendant companies or they would lose their shares.  Shailesh, Rajesh, and Chetan each filed a declaration in the Shashi action attesting there was no oral partnership agreement among the brothers or with Shashi involving California real estate and they had no ownership or other interest in the defendant companies.[9]  At trial, the three brothers admitted they lied in those declarations.

In 2004, according to Shailesh, Haresh told the brothers he would distribute their shares of the profits from the real estate portfolio after the Shashi action ended; Shailesh said they agreed.  The three brothers testified Haresh assured them "many times" during their meetings in India that he would distribute the real estate profits once the Shashi action ended.  The three brothers also testified that, during their semi-annual meetings, Haresh repeatedly referred to them as "partners."  Chetan testified he heard Haresh say many times at their meetings, " 'We are not brothers.  We are partners.  Talk about partners.  Don't talk about brothers.' "

---

[9]     Shashi then dismissed Shailesh, Rajesh, and Chetan from his lawsuit in 2005.

Haresh testified he never referred to his brothers as his partners after 1978.  He also denied that he ever told his brothers he would divide the profits from the real estate portfolio after the Shashi action ended.

**5.      *2010 and later events***

In late spring 2010, Shailesh, Rajesh, and Chetan went to Israel and met with Haresh.  The testimony about what occurred conflicts.  Haresh testified the brothers took diamonds from his company stock in Israel and sent them to Jogdiam Belgium.  Haresh said Shailesh asserted he was Haresh's partner and wanted his partnership share.  Haresh denied they were partners.  He said the three brothers then became angry and pushed him into a chair.  Chetan and Shailesh, on the other hand, testified the three brothers went to talk to Haresh about moving the diamond stock out of Israel to Belgium because the diamond market had fallen.  Chetan and Shailesh denied any pushing or shoving occurred.  Shailesh testified they had a " 'hard discussion.' "

Shailesh testified that while in Israel he asked Haresh for money from the real estate investments.[10]  He said Haresh agreed to pay him, but Shailesh admitted he did not receive his share then.[11]  Shailesh also testified Haresh never denied their partnership.

Near this same time, in May 2010, there was an email exchange between Pinkal and the president of one of Haresh's

---

[10]      Shailesh apparently needed money for a family expense.

[11]      Shailesh admitted he was aware that, since 1995, Haresh had never distributed any profits from the real estate portfolio to him.

8

companies with Haresh, Rajesh, Chetan and others copied.[12] In response to an apparent dispute with the president, Pinkal asserted there were " 'four partners[ ] in the company' "—Haresh, Shailesh, Rajesh, and Chetan.  Haresh responded, " 'What you have said is absolutely not true.  I am the sole director and owner of H.K. Realty and J.K. Properties.' "  Pinkal answered, " 'It is absolutely true. . . .  On the book you are the sole director and owner.' "  Haresh again replied, " 'Absolutely not true.' "  Rajesh and Chetan did not reply to the exchange.[13]

Chetan and Shailesh testified that after the 2010 Israel meeting, through 2012, Haresh continued to tell the three brothers he would distribute their share of the real estate profits when the Shashi action resolved.

During this time, Shailesh also was embroiled in a dispute with Haresh in India.  Around 2012, one of Haresh's diamond companies sued Dialust, Shailesh, and Rajesh in Mumbai, India for money owed for a diamond shipment.  Shailesh's and his brother's position was that the shipment was part of the family partnership effort.  In this trial, Haresh introduced Shailesh's testimony from that matter:  Shailesh admitted he was not a partner or director in any of the defendant companies; and,

---

[12]     Pinkal testified he did not copy his father on the email because Shailesh does not understand English; he does not have an email address.

[13]     Pinkal testified Haresh called him right after the email exchange and asked him why he was " 'putting all this stuff in writing' " with the lawsuit going on.  Pinkal testified Haresh reaffirmed, " 'Once the case is over, I'm going to give you guys all the money.' "  Chetan testified he did not reply to the emails because Haresh called him and told him not to answer the e-mails; he would give " 'everybody their part.' "

when asked about his investment in the real estate partnership, he testified, " 'We were moral partners. I was not a financial partner.' "[14]

Shailesh testified he believed Haresh would distribute the real estate profits at the end of the Shashi case—which was still pending—up until January 2013. At that point, Haresh would not explain to Shailesh why he had fired Pinkal in December 2012. Shailesh then knew Haresh "wasn't going to give [him] any money."

### 6. *Shailesh's lawsuit*

On November 25, 2014, Shailesh filed this lawsuit against Haresh and his companies for $250,000,000—his alleged share of the profits from the California real estate investments. Shailesh's second amended complaint (SAC), the operative complaint, alleged causes of action for breach of oral contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, fraud, accounting, and declaratory relief. Shailesh had amended his complaint twice after the trial court sustained defendants' demurrers to Shailesh's fraud cause of action with leave to amend. Defendants filed a third demurrer; the trial court sustained it without leave to amend as to the SAC's fraud cause of action.

#### a. *Bifurcation of statute of limitations defense*

Defendants answered the SAC and asserted the statute of limitations as an affirmative defense. They moved to bifurcate the trial to have their defense tried before the merits. Defendants contended Shailesh knew or reasonably should have known Haresh had disavowed the brothers' alleged partnership

---

[14] During this trial, Shailesh testified he corrected his answer to state he was an oral partner. By " 'moral partners,' " he meant " 'nothing was written down.' "

before November 25, 2012 and 2011, so the applicable two- and three-year statute of limitations periods had expired. Shailesh opposed bifurcation. He argued the statute of limitations did not begin to run before November 2011 or 2012 because Haresh had assured Shailesh repeatedly that he would honor the partnership at the end of the Shashi action and that action had not concluded. The trial court granted the bifurcation. Shailesh does not challenge that decision on appeal.

      b.    *Defendants' motion in limine to exclude recordings*

At trial Shailesh sought to introduce "snippets" of five audio recordings Chetan made on his phone—between 2003 and 2010—of the brothers' discussions during their semi-annual meetings in India. In them, Haresh refers to his brothers as his partners and tells them he will distribute the profits from the real estate investments at the end of the Shashi action. Most of the conversations were in Gujarati. At one point, Haresh apparently can be heard saying in English, " 'We are partners, not brothers.' " Shailesh sought to introduce the recordings to demonstrate the existence of the brothers' partnership, and to undermine Haresh's credibility.

Before trial, defendants had moved in limine to exclude the audio recordings on the grounds (1) Shailesh could not adequately authenticate them; (2) they contained inadmissible hearsay; and (3) Penal Code section 632,[15] or public policy, precluded their admission because Haresh did not consent to the recordings. Defendants alternatively asked for a hearing

---

[15]    Generally, Penal Code section 632 makes recordings of secretly recorded confidential communications inadmissible in legal proceedings.

11

under Evidence Code section 402.[16]  Shailesh opposed the motion, primarily arguing it was premature and Penal Code section 632 did not apply because the recordings were made in India.

During trial, but outside the presence of the jury, the court held an evidentiary hearing under section 402 over several court sessions.  Defendants' expert testified.  He had not listened to or examined the recordings.  He testified generally about the problems that could arise in establishing the chain of custody of a recording (particularly here where the recordings were not original and may have been made in India), the need forensically to examine the recording to verify its authenticity and confirm it had not been altered, and the importance of the chain of custody to that determination.  He also said a foreign language recording normally is transcribed in the recorded language first, then translated into English.

Shailesh's counsel made an offer of proof as to what Chetan would say to authenticate the audio recordings.  Chetan would testify he attended the brothers' meetings in person in India, and "to help him remember, he would sometimes record these meetings" with his phone.  After recording the meeting, Chetan transferred the digital recording from his phone's memory card to a computer and a USB drive where the recording remained for some amount of time.  After he amassed several recordings, Chetan apparently gave a copy of them on a USB drive to an unidentified translator, who translated the recordings from Gujarati to English and prepared a transcript.  The translator returned the audio recordings and transcript to Chetan, and he in turn delivered them to his attorney who produced them during discovery in a related case involving Haresh.  Chetan also would

_____

[16]     Further undesignated statutory references are to the Evidence Code.

12

testify he did not alter the recordings, he listened to them and could identify the voices, and they accurately reflected what was said at the meetings he attended.

In response, defense counsel argued they needed more information to authenticate the recordings: the dates of each recording, details about the alleged conversations that were recorded, the participants and where the conversations took place, why the original recordings had not been produced, the location of the memory cards, USB drives, and computers, and the type of phone used. Counsel also noted the recordings picked up in the middle of conversations and ended before they were over; the transcript did not appear to have been translated by fluent English speakers; and the transcripts acknowledged periods of silence on the recordings that were "inherently suspicious."

Although defendants had not raised it in their motion, the court found there was "a wealth of [section] 352 issues in terms of admitting" the recordings. The court voiced its concerns about the recordings' authenticity, chain of custody, and translation, the age of some of the recordings, and California's public policy against using surreptitiously recorded evidence. Nor was the court convinced the recordings would help the jury decide the issue before it—what Shailesh had reason to know, and when, about Haresh's alleged breach—or that their ability to impeach Haresh was as strong as Shailesh claimed.

For one thing, the jury already had heard from Chetan and others about what Haresh said during these meetings. If the recordings were admitted, Chetan would simply be explaining, " 'That's Haresh speaking.' " And, because the recordings were in Gujarati, it likely would be "impossible" for the jury "to tell who's speaking," particularly as the recordings would be "filtered" through the interpreters. The jury again would have to "rely[ ]

13

totally on Chetan as to who's doing the speaking." In essence, Chetan would be repeating his earlier testimony.

Shailesh's counsel argued the jury could hear Haresh say in English, "We are partners, not brothers," directly contradicting his sworn testimony. Because Shailesh did not speak or understand English, however, the audio recording of that statement was not probative of what Shailesh knew. Nevertheless, counsel maintained Haresh's recorded statements—referring to the brothers as "partners" and agreeing to distribute the brothers' shares in the real estate portfolio after the Sashi action ended—went to "the heart of the issue of credibility." Counsel asserted that, by excluding the recordings, the court was preventing him from rebutting defense counsel's anticipated argument that that the jurors should not credit the brothers' testimony. He wanted to argue they needn't take the brothers' word for what Haresh said; they "heard [Haresh's own] voice on the tape." Counsel contended, "The most key piece of evidence in this case is [Haresh's] own voice contradicting himself. What could be more probative than that?"

The court concluded it was "not worth the risk" to admit the recordings, given they had "all kinds of problems with the admissibility," and granted the motion in limine.

c.    *The special verdict and judgment*

The jury returned a special verdict in favor of defendants on their statute of limitations defense. The special verdict form posed one question for each cause of action asking the jury to find whether Shailesh had reason to know "he had suffered harm relating to the California real estate partnership" as a result of Haresh's wrongful conduct on or before November 25, 2012, for Shailesh's breach of oral contract and breach of the good faith and fair dealing claims, or on or before November 25, 2011, for the breach of fiduciary duty claim.

14

The court then decided Shailesh's equitable claims, finding in favor of defendants on his claim that Haresh should be estopped from asserting the statute of limitations defense, as well as on his claims for an accounting and declaratory relief. The trial court entered its final statement of decision on August 27, 2019, after rejecting Shailesh's objections to its tentative statement of decision. Shailesh does not challenge these findings. The trial court entered judgment on October 8, 2019, and Shailesh timely appealed. We granted defendants' motion to augment the record with defendants' and Shailesh's amended proposed special verdict forms.

## DISCUSSION

Shailesh contends the judgment should be reversed and the matter remanded for a new trial on three grounds: the special verdict form is fatally defective; the trial court abused its discretion when it excluded the audio recordings of Haresh's admissions—to Shailesh's prejudice; and the trial court erred in sustaining defendants' demurrer to the SAC's fraud cause of action.

### 1. *Special verdict form*

Shailesh contends the special verdict form did not require the jury to make specific findings on all the issues material to defendants' statute of limitations defense and, thus, it does not support the judgment in defendants' favor. Shailesh does not contend the jury's findings are unsupported by the evidence.

### a. *Standard of review and applicable law*

We review the correctness of a special verdict form de novo. (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 325 (*Saxena*).) In a special verdict, the jury finds facts only, leaving the judgment to the court. (Code Civ. Proc., § 624.) "The special verdict must present the conclusions of fact as established by the evidence, and not the evidence to prove them; and those conclusions of fact

15

must be so presented as that nothing shall remain to the Court but to draw from them conclusions of law." (*Ibid.*)

"A special verdict is 'fatally defective' if it does not allow the jury to resolve every controverted issue." (*Saxena, supra,* 159 Cal.App.4th at p. 325.) In other words, "[i]f a fact necessary to support a cause of action [or affirmative defense] is not included in . . . a special verdict, judgment on that cause of action [or defense] cannot stand." (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 531 (*Behr*) [where complaint alleged separate causes of action for fraudulent concealment and misrepresentation, special verdict was insufficient to support judgment in favor of plaintiff on misrepresentation claim because form asked if defendant concealed information but not whether he made an affirmative misrepresentation].) A special verdict form is not defective, however, merely because it does not ask the jury to make separate findings on each element of a given cause of action. (See *Babcock v. Omansky* (1973) 31 Cal.App.3d 625, 630–631 [interrogatories on separate elements of fraud not necessary where special verdict form included single question on ultimate issue of fraud and jury had been instructed on the elements], superseded on another ground by Civ. Code, § 3439.02.)

> b. *Shailesh has forfeited his challenge to the special verdict form, and, in any event, it is not fatally defective*

For the first time on appeal, Shailesh contends the trial court erred by presenting the jury with a special verdict form that asked only whether Shailesh should have known Haresh's wrongful conduct caused him harm outside the statute of limitations period. He asserts the jury was required to determine (1) whether Haresh terminated the partnership agreement, and,

16

if so, (2) when he terminated it—issues material to resolving whether the statute of limitations barred his claims.

In essence, relying on *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, Shailesh argues Haresh's purported repudiation of the alleged partnership agreement or failure to distribute the partnership proceeds did not trigger the running of the limitations period because his performance was not due until the Shashi action ended. (*Id.* at pp. 486, 489 [where promisor repudiates contract, plaintiff may treat repudiation as an anticipatory breach of the contract and sue immediately or treat repudiation as empty threat and await time for performance; thus, statute of limitations period did not begin to run until employer actually fired plaintiff although it informed plaintiff two years earlier that he would be fired].) Because that action had not concluded, and Haresh had ongoing contractual obligations, Shailesh argues his claims could not have accrued until he elected to treat Haresh's breach as terminating the partnership after December 2012. (*Id.* at p. 489 ["when there are ongoing contractual obligations the plaintiff may elect to rely on the contract despite a breach, and the statute of limitations [period] does not begin to run until the plaintiff has elected to treat the breach as terminating the contract"].) Shailesh appears to contend that, as a result, even if Haresh's conduct harmed him before November 2012, the statute of limitations was not triggered unless Haresh terminated the partnership before that date. Based on this theory, he now contends the jury's finding that he was harmed before November 2012 was insufficient to trigger the statute of limitations and thus does not support the judgment.

"A party who fails to object to a special verdict form ordinarily waives any objection to the form," however. (*Behr, supra*, 193 Cal.App.4th at p. 530; *Zagami, Inc. v. James A.*

17

*Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1093, fn. 6 ["if the *form* of a verdict is defective, the complaining party must object or risk waiver on appeal of any such defect"]; *Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 550–551 [failure to object in trial court to special verdict form on ground asserted on appeal forfeited that claim of error]; *Mardirossian & Associates, Inc. v. Ersoff* (2007) 153 Cal.App.4th 257, 277 (*Mardirossian*) ["Because [appellant] did not challenge the special verdict form on this ground below, we do not consider it for the first time on appeal."].)

As defendants note, there is no evidence in the record that Shailesh ever objected to the special verdict form in the trial court or asked the court to include the specific interrogatories "he now considers 'crucial.' " (See *Behr, supra*, 193 Cal.App.4th at pp. 529-530 [in case involving transmission of disease, defendant forfeited challenge to special verdict form's failure to specify timing of plaintiff's infection when defendant, not plaintiff, believed findings as to the timing were essential to determine his liability, but neither asked the court to include those questions nor sought to clarify or correct the verdict before the jury was discharged]; but see *id.* at pp. 531-532 [finding forfeiture rule did not apply where special verdict omitted finding necessary to support judgment, explaining, "[i]f [plaintiff] chose not to include a proposed factual finding essential to one of her claims, it [was] not incumbent on . . . defendant[ ] to make sure the omission [was] cured"].)

Admittedly, there are exceptions to this forfeiture rule. For example, a forfeiture will not be found " 'where the record indicates that the failure to object was not the result of a desire to reap a "technical advantage" or engage in a "litigious strategy." ' " (*Behr, supra*, 193 Cal.App.4th at p. 530.) The court also need not find a forfeiture where the appellant challenges

the special verdict as "fatally inconsistent" or failing to support the trial court's entry of judgment on a particular theory— as Shailesh purports to do here. (*Id.* at pp. 530–531*; Saxena, supra*, 159 Cal.App.4th at pp. 326–328 [defendant did not forfeit challenge to special verdict form prepared by plaintiff in a medical negligence and battery case where the verdict form asked if patient gave " 'informed consent,' " but did not ask if patient gave " 'no consent' at all"—a necessary element for medical battery—rendering verdict fatally defective; defendant's failure to object also was not part of a litigation strategy as he already had argued the difference between the two concepts and objected to jury instructions equating informed consent with consent].)

Nevertheless, based on this record, we agree with defendants that Shailesh has forfeited his challenge to the special verdict form. First, nothing in the record clearly shows Shailesh's failure to object to the special verdict form, or to propose the questions he now contends were necessary, was *not* part of a litigation strategy. For example, the record does not show Shailesh accepted the special verdict, as defense counsel did in *Saxena*, after failing to convince the trial court his theory required different jury instructions. We need not speculate on his trial counsel's reasons for failing to ask the court to include questions specific to whether and when Haresh terminated the partnership agreement, however.

In his reply to defendants' forfeiture argument, Shailesh asserts he opposed defendants' motion to bifurcate and argued the statute of limitations issue " 'include[ed] the continuing events wherein Plaintiff was being reassured [that] Haresh Jogani would honor the partnership following the conclusion of [the Shashi action.]' " He notes he also argued the merits of his claims were " 'intertwined with the evidence necessary to resolve the statute of limitations affirmative defense.' "

19

But, Shailesh does not challenge the trial court's decision to try the statute of limitations issue first. Nor does he argue he objected to the special verdict form as requiring additional findings to resolve that issue.

Not only did Shailesh fail to object to the special verdict form; if there was any error, Shailesh invited it. Shailesh's proposed verdict form submitted to the court required the jury to determine only the timing of Shailesh's harm—not whether (or when) Haresh terminated the alleged partnership. "Under the doctrine of invited error, when a party by its own conduct induces the commission of error, it may not claim on appeal that the judgment should be reversed because of that error." (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212.) The doctrine does not apply, however, "when a party, *while making the appropriate objections*, acquiesces in a judicial determination." (*Ibid.*, italics added.) Thus, an attorney who submits to an adverse ruling, having made appropriate objections or motion, does not forfeit the claim of error in the ruling by trying " ' "to make the best of a bad situation." ' " (*Id.* at pp. 212–213.)

Here, the trial court adopted—almost word for word— the second interrogatory Shailesh's proposed special verdict form posed for each cause of action. Shailesh's proposed interrogatories were:

    (1)   "[D]id Shailesh Jogani's claimed harm relating to the California real estate partnership occur before November 25, 2012?" and

    (2)   "Before November 25, 2012, did Shailesh Jogani know of facts that would have caused a reasonable person to suspect that he had suffered harm relating to the California

20

real estate partnership that was caused by Haresh's wrongful conduct?"[17] The court did not think the first question was necessary.[18] The court proposed the verdict form "just go right to [Shailesh's proposed] second question, which is very much like the first question of the defendants' [proposed form]." The special verdict form provided to the jury asked,

> "With respect to Plaintiff's First Cause of Action for Breach of Oral Contract [or other cause of action], on or before November 25, 2012 [or 2011], did Shailesh Jogani know of facts that would have caused a reasonable person to suspect that he had suffered harm relating to the California real estate partnership that was caused by Haresh Jogani's wrongful conduct?"

At no time during the discussion about the special verdict form did Shailesh's counsel ask the court to add questions about whether Haresh terminated the partnership agreement or argue the special verdict form did not preserve his anticipatory breach theory.

---

[17] The questions posed for the breach of fiduciary duty cause of action reflected the three-year statute of limitations period—November 25, 2011. We discuss the special verdict form in terms of Shailesh's cause of action for breach of oral contract—the focus of his argument. Our analysis applies equally to his two other claims.

[18] Shailesh does not contend the trial court erred by omitting his first proposed interrogatory from the special verdict for each cause of action.

21

Nor was Shailesh simply making the best of an adverse judicial determination by submitting his proposed form without the specific interrogatories he contends are essential. As we discuss, his proposed verdict form tracked the language from the pattern CACI No. 388 instruction that *he requested*. The court included that language in the special jury instructions on the statute of limitations. Shailesh may have opposed the court's decision to try the affirmative defense first, but the court never ruled he could not present to the jury his theory that he had not been harmed before November 2012. For example, nothing in the record shows Shailesh asked the court to instruct the jury on anticipatory breach and that the court refused. (See *Saxena, supra*, 159 Cal.App.4th at p. 329 [invited error doctrine did not apply where defendant also submitted proposed verdict form that omitted finding on actual consent where trial court had rejected defense counsel's repeated argument that informed consent and actual consent differed and thus made the best of a bad situation that was not of his doing].) Having gotten what he asked for, Shailesh cannot now contend the court committed reversible error by doing so.

Finally, findings as to whether and when Haresh terminated the partnership were not necessary to support the judgment on defendants' statute of limitations defense. The verdict form followed the legal principle articulated in the jury instruction Shailesh proposed that, to succeed on their statute of limitations defense, defendants must prove Shailesh's "claimed harm occurred before November 25, 2012." The instructions incorporated—ironically, over Shailesh's objection—the elements to establish a breach of contract cause of action: the parties entered into an oral contract, Shailesh performed, the conditions required for Haresh's performance had occurred, Haresh did not perform his contractual obligations, Shailesh

22

was harmed, and Haresh's breach of oral contract was a substantial factor in causing Shailesh's harm.[19] At Shailesh's request, the court also instructed the jury that "[a] contract cause of action does not accrue until the contract has been breached." The instruction concluded, "A claim accrues when the plaintiff discovers or could have discovered through reasonable diligence the injury and its cause." Shailesh does not claim instructional error.

If the jury followed the court's instructions—and we presume it did (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803 (*Cassim*))—its finding that Shailesh knew of facts indicating Haresh's wrongful conduct had caused him harm before November 25, 2012, necessarily subsumed a finding that Haresh had breached their oral contract before that date, i.e., the occurrence of the conditions requiring his performance, his nonperformance, and its causation of Shailesh's harm. The jury's verdict thus resolved the only controverted issue in this phase of the trial—whether Shailesh's claimed harm— e.g., Haresh's breach of their oral contract—accrued before November 25, 2012. There was no need for separate findings as to the "elements" of that breach to support the judgment finding the statute of limitations barred Shailesh's claims. (See, e.g., *J.P. v. Carlsbad Unified School Dist.* (2014) 232 Cal.App.4th 323, 340–341 [special verdict that generally asked if defendant should be estopped was sufficient where court "fully instructed"

---

[19] The jury instructions also included the elements on Shailesh's other two claims. Shailesh objected to including the elements in the jury instruction—he thought the jury would be confused because it was being asked to assume, not decide, the existence of a contract. Rather, the jury was being asked to decide *when* the breach of contract occurred.

the jury on proof required to establish estoppel; in finding defendant should be estopped, "the jury necessarily found that each of the elements of estoppel had been proven"]; *Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 364–365 [court did not err in refusing to include questions on defense of impossibility or impracticality in breach of contract special verdict form when jury was instructed to find defendant's performance excused if defenses were established; jury's finding that breach occurred showed it did not find defendant's performance impossible or impractical].)

As defendants note, Shailesh really "is attempting to overturn . . . the jury's verdict that he had knowledge that harm occurred before November 25, 2012." For example, the jury could have determined no reasonable person would believe Haresh's assurances, and he had in fact terminated the alleged partnership long before November 2012. Because Shailesh does not challenge the sufficiency of the evidence, we need not determine if the evidence was sufficient to support such a finding.

Needless to say, Shailesh argued his theory of the case to the jury; we presume the jury rejected it. Indeed, during his closing argument, Shailesh's counsel specifically explained how the questions posed in the verdict form related to Shailesh's theory of the case and exactly when Shailesh believed his "claimed harm" had occurred. Counsel argued the evidence showed the brothers agreed to put the profits from the real estate partnership back into the partnership's investments. Thus, Shailesh could not have been harmed for purposes of the statute of limitations—as Haresh's counsel had argued—when Haresh failed to distribute those profits before November 2012 because Haresh's conduct was not "wrongful"—Shailesh had agreed to the arrangement.

24

Counsel repeatedly asked the jury to consider "what was the harm" Haresh's wrongful conduct caused Shailesh, arguing Haresh's statements to pay the brothers when the Shashi case ended was not a breach of their agreement (and thus caused no harm) and that Shailesh agreed to that arrangement (and thus was not yet harmed). Counsel argued, "And the law says, as you see, unless you suffer harm from Haresh Jogani's wrongful conduct, unless you do, you must write 'No.' The statute doesn't run." "[I]n looking at the verdict form that you're going to be asked to answer these questions, what harm was suffered? By what wrongful conduct? He agreed to it." Counsel's argument itself demonstrates the sufficiency of the special verdict form.

Yet, if Shailesh believed the special verdict form had to include specific questions to preserve his theory Haresh had ongoing contractual obligations that he had not breached before November 25, 2012, Shailesh was required either to include those questions in his proposed special verdict form or to object to the special verdict form in the trial court. (*Mardirossian, supra*, 153 Cal.App.4th at p. 277 [party forfeited right to challenge special verdict where it did not raise challenge in the trial court and party's own proposed verdict form did not include the information party claimed on appeal had been erroneously omitted]; *Behr, supra*, 193 Cal.App.4th at p. 530 [where defendant thought specific findings were important to establish whether he was liable to plaintiff, "[i]t was . . . incumbent on him to see that [those] findings . . . were included in the verdict"].) He did neither. At best, he has forfeited his challenge to the special verdict on appeal. (*Ibid*.) At worst, he invited the purported error, and, as a result, is bound by the purportedly defective special verdict form. (*Saxena, supra*, 159 Cal.App.4th at p. 329.)

## 2. *The excluded recordings*

Shailesh contends the trial court committed prejudicial error by excluding his "silver bullet" impeachment evidence—the audio recordings of Haresh purportedly contradicting his testimony at trial that: (1) after 1978, he never told his brothers they were partners, and (2) he never told his brothers he would distribute the profits from the real estate partnership when the Shashi action concluded.

### a. *Standard of review and applicable law*

We review a trial court's evidentiary rulings for abuse of discretion. In so doing, we review the trial court's ruling, not its rationale. (*Park v. First American Title Co.* (2011) 201 Cal.App.4th 1418, 1427, citing *Salazar v. Southern Cal. Gas Co.* (1997) 54 Cal.App.4th 1370, 1376.) "If evidence is excluded on an improper objection but the evidence excluded is subject to objection on a different ground, it does not matter that the reason advanced by counsel or relied upon by the court was wrong. [Citations.] If the exclusion is proper upon any theory of law applicable to the instant case, the exclusion must be sustained regardless of the particular considerations which may have motivated the trial court to its decision. [Citations.]" (*Philip Chang & Sons Associates v. La Casa Novato* (1986) 177 Cal.App.3d 159, 173.)

Under section 352, a trial court has discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." " 'A trial court's exercise of discretion under . . . section 352 will be upheld on appeal unless the court abused its discretion, that is, unless it exercised its discretion in an arbitrary,

capricious, or patently absurd manner.' " (*People v. Johnson* (2019) 8 Cal.5th 475, 521.)

     b.    *The trial court did not abuse its discretion*

Shailesh challenges as legally erroneous each individual basis the court articulated in reaching its decision to exclude the audio recordings. He argues: Chetan's testimony was sufficient as a matter of law to authenticate the recordings and establish their chain of custody and, thus, the fact they were in Gujarati, of partial conversations, and older, were not valid bases to exclude them; the recordings of Haresh's admissions in his own voice were not cumulative of the brothers' earlier testimony of what he said to them, carried much greater weight than Chetan's testimony, and were the "best evidence" of Haresh's statements during the brothers' meetings; and Penal Code section 632 did not apply because Chetan made the recordings in India and would testify he told everyone he was recording the meetings.[20]

Had the court excluded the recordings on one of these bases alone, we might agree it erred. As Shailesh argues, Chetan's proffered testimony was legally sufficient to lay a foundation for the recordings' admissibility. (See, e.g., *People v. Patton* (1976) 63 Cal.App.3d 211, 214–215, 220 [tape recording of phone conversation adequately authenticated where participant testified recording was accurate and complete except for gap at beginning due to recording malfunction]; *id.* at p. 220 ["tape recording is not barred by the best evidence rule merely because a witness to the conversation is available"].) It also is true, as Shailesh asserts, "[e]vidence that is identical in subject matter

---

[20]    The court made clear Penal Code section 632 did not apply to the recordings, but expressed its concern they implicated California's strong public policy against using surreptitiously obtained recordings in court.

to other evidence should not be excluded as 'cumulative' when it has greater evidentiary weight or probative value." (*People v. Mattson* (1990) 50 Cal.3d 826, 871; see also, e.g., *People v. Jablonski* (2006) 37 Cal.4th 774, 806 [audio recording of defendant "sequentially recounting the circumstances of his crimes in great detail," not cumulative despite testimony defendant had capacity to act rationally; recording was "uniquely probative in a way that neither [an expert's] report nor the testimony of other witnesses could be"].)

But, the trial court did not exclude the recordings on just one of these bases.[21] Instead, the court considered the totality of the circumstances and found a "wealth" of issues under section 352 that weighed against admitting the recordings.

Shailesh's offer of proof of Chetan's testimony revealed gaps in the recordings' chain of custody, and defense counsel revealed issues relating to their authenticity—including indicia of possible alteration, such as unexplained periods of silence within them. Nor did the recordings capture the entirety of conversations they recorded—apparently starting in the middle of a conversation and ending before that conversation had concluded—raising concerns about missing context or purposeful omission of parts of the discussion. Also, the transcripts did not inspire confidence in the accuracy of the recordings' transcription or translation from Gujarati to English—they were "replete with spelling errors [and] untranslated words."

In the court's words, there were "all kinds of problems with the admissibility of these audio files" discussed over the course of the section 402 hearing. The court concluded it was "not worth the risk" to admit them in light of the court's many

---

[21] As a result, we need not address each of Shailesh's arguments.

concerns given (1) the probative value of the recordings was "really not there" for this phase of the trial—the jury was not deciding whether an oral partnership existed or equitable estoppel applied;[22] and (2) the jury already had heard the precise statements Haresh purportedly made in the recordings during Chetan's testimony and had heard Shailesh and other witnesses testify about Haresh's representations to them. Yet, Shailesh completely ignores the court's finding that the recordings implicated "serious" concerns under section 352. Indeed, on appeal he does not address section 352 at all.

Instead, he argues—as he did to the trial court—that the audio recordings were "powerful and compelling" impeachment evidence against Haresh, directly contradicting—in his own voice—his earlier testimony that he never told his brothers they were partners, and never promised to distribute the profits from their real estate partnership at the end of the Shashi action. He again asserts the recordings of Haresh's admission were vital to rebut defense counsel's anticipated closing argument that the jury could not believe Chetan's testimony—or Shailesh's or Rajesh's—about what Haresh said because they were admitted perjurers. At trial, counsel posited, "[W]hat best evidence would there be, when they're going to challenge the credibility of Chetan Jogani[, than] to say, here's a tape with a voice being heard by the jury of Haresh Jogani saying the exact opposite of what he testified repeatedly under oath. Now we don't have to even talk

---

[22] The court, rather than the jury, decided Shailesh's claim that Haresh was equitably estopped from asserting the defense of the statute of limitations. For purposes of deciding that issue, the court presumed the recordings included Haresh's statements that the brothers testified he made.

about the credibility of Chetan Jogani because we have Haresh's own spoken word on audiotape."

We do not disagree that hearing a party's statements in his own voice on a recording can have greater impact than hearing a witness relay what the party said.  As the trial court alluded, however, the devastating impact Shailesh expected the "silver bullet" recordings to make on Haresh's credibility was not there.  Except for Haresh's purported statement in English that " '[w]e are partners, not brothers,' " the voices the jury would hear on the recordings would be in Gujarati.  Instead of "hearing" Haresh's purported admissions in his own voice, therefore, the jury would hear his statements—and any reaction Shailesh had to them—translated through an interpreter.  The court was not unreasonable in anticipating the jury would be unable to tell who was speaking with the recorded voices "filtered through . . . a couple translations."  In the end, the jury would have to "rely[ ] totally on Chetan as to who's doing the speaking," and he already had testified to what Haresh said.

" 'The weighing process under [Evidence Code] section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules.' " (*Evans v. Hood Corp.* (2016) 5 Cal.App.5th 1022, 1044–1045.)  In light of its many concerns, the court believed it would be "a minefield" to "get[ ] into" the audio recordings.  On this record, we cannot conclude the trial court's assessment—that the probative value of the recordings was outweighed by the likelihood their admission would confuse the issues or mislead the jury—was arbitrary, capricious, or patently absurd.

### c. *Shailesh has not established prejudice*

Even if the trial court abused its discretion, the erroneous exclusion of evidence is not reversible error unless it caused a "miscarriage of justice." (Cal. Const., art. VI, § 13; Evid. Code, § 354.) " '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*Cassim, supra*, 33 Cal.4th at p. 800.) In this context a reasonable probability " 'does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility.' " (*D.Z. v. Los Angeles Unified School Dist.* (2019) 35 Cal.App.5th 210, 231.)

We cannot conclude it reasonably probable that, had it heard the recordings, the jury would have found Shailesh could not have known before November 2012 that he had been harmed by Haresh's wrongful conduct. First, as the trial court noted, because Shailesh does not understand English, Haresh's recorded statement in English that the brothers were partners would not show Shailesh's knowledge of that specific representation. Moreover, the recordings included discussions only until 2010— two years outside the statute of limitations period. Thus, representations Haresh made in 2010, including his purported promise to pay the partnership proceeds at the end of the Shashi action, would not have affected the jury's conclusion Shailesh should have known Haresh had harmed him before 2012.

Finally, to accept the recordings' accuracy, the jury would have had to believe Chetan when he laid the foundation that the recorded conversations were accurate and had not been altered from the time he recorded them on his phone nine to 16 years earlier. Yet, one of the very reasons Shailesh wanted to introduce the recordings was the jury's potential disbelief of

31

Chetan's testimony about what Haresh said at these meetings. It follows, as defendants argue, that if the jurors were likely to discredit Chetan's testimony about what Haresh said, there was no more than an " 'abstract possibility' " they nevertheless would believe Chetan's testimony about the accuracy of the recordings containing those statements. (*D.Z., supra*, 35 Cal.App.5th at p. 232.)

### 3. *Shailesh's dismissed fraud claim*

Shailesh also contends the trial court erred when it sustained defendants' demurrer to his fraud cause of action. A court of appeal will reverse a trial court's error "in ruling on matters relating to pleadings . . . only if the appellant can show resulting prejudice, and the probability of a more favorable outcome, *at trial*." (*Waller v. TJD, Inc.* (1993) 12 Cal.App.4th 830, 833.) Thus, Shailesh must show not only that the trial court erred in sustaining the demurrer, but also that the error was prejudicial. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475.)

The statute of limitations period for fraud is three years—the same period that applied to Shailesh's breach of fiduciary duty claim. (Code Civ. Proc., § 338, subd. (d).) For Shailesh's breach of fiduciary duty claim, the jury responded "yes" to the special verdict form's question: "on or before November 25, 2011, did Shailesh Jogani know of facts that would have caused a reasonable person to suspect that he had suffered harm relating to the California real estate partnership that was caused by Haresh Jogani's wrongful conduct?"

The wrongful conduct for all of Shailesh's claims arose out of the same set of alleged facts: the four brothers ran their businesses as partners with each having an interest in a percentage of the collective profits; in 1995, Haresh orally agreed to invest the four brothers' funds in the California real estate market for their mutual benefit; he agreed to manage the real

32

estate portfolio through the defendant companies for their collective benefit; during conversations from 1995 through 2012 Haresh orally confirmed to Shailesh that his "partnership interest was intact" and Haresh would distribute his share of the real estate portfolio after the Shashi action resolved; and not until after December 2012, did Shailesh "c[o]me to believe and understand that Haresh was disavowing" their partnership and asserting the partnership did not own the real estate portfolio.

Haresh's alleged wrongful conduct specific to his fraud claim essentially was the same as that underlying his other causes of action, including breach of fiduciary duty:[23] Haresh represented in 1995 that he would conduct the brothers' businesses as a partnership and manage the real estate investments for their collective benefit; he assured Shailesh from 1995 through 2012 that Shailesh's interest in the partnership was intact and he would receive distribution of his share of the proceeds after the Shashi action resolved; Haresh failed to disclose his "secret intention" not to honor the parties' agreement and to deny Shailesh his interest in the real estate portfolio; and, as with all of the other causes of action, Shailesh did not discover until December 2012 that Haresh did not intend to honor their agreement or act in Shailesh's and the other brothers' best interests.

Shailesh does not explain how the jury—had his fraud claim proceeded to the bifurcated trial on the statute of

---

[23] Shailesh's breach of fiduciary duty claim added Haresh breached his fiduciary duty to Shailesh by "denying the existence of the [p]artnership" and Shailesh's interest in it, making distributions to himself but not to Shailesh, and taking equity from the real estate portfolio without distributing Shailesh his share.

limitations issue—would be able to find his fraud claim was not barred when, based on the same underlying facts, it found his breach of fiduciary duty claim was.[24] (See *Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, 1500 [any error in granting nonsuit not prejudicial where jury returned verdict in defendant's favor and facts to be proved as to dismissed and tried claims were the same].) Indeed, given Shailesh asserted Haresh's wrongful conduct caused the same harm for all of his causes of action— the deprivation "of the benefit of his proportionate interest in the real estate held"—the jury could only have found that, for Shailesh's fraud claim, he knew of facts, on or before November 25, 2011, "that would have caused a reasonable person to suspect that he had suffered harm relating to the California real estate partnership [or any other part of the brothers' alleged partnership] that was caused by Haresh's . . . wrongful conduct."

For the same reasons, the trial court court's rationale for finding the doctrine of equitable estoppel did not apply to Shailesh's contract and fiduciary duty claims also would have applied to Shailesh's fraud claim had it overruled the demurrer. Accordingly, we need not determine whether the trial court erred in sustaining the demurrer because Shailesh cannot demonstrate prejudice in any event. (See, e.g., *Grell v. Laci Le Beau Corp.* (1999) 73 Cal.App.4th 1300, 1307 [order sustaining improperly filed demurrer harmless where court's later conclusion on summary judgment that statute of limitations was not tolled would have applied to all claims]; *Curtis v. Twentieth Century-*

---

[24] Shailesh simply repeats the SAC's allegations and argues they sufficiently pleaded the elements of fraud. He does not address the issue of prejudice at all. We will neither presume prejudice nor act as Shailesh's counsel "by furnishing a legal argument as to how the trial court's ruling was prejudicial." (*Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 963.)

34

*Fox Film Corporation* (1956) 140 Cal.App.2d 461, 464–465, 469 [where two counts of complaint were based on same allegations order sustaining demurrer on one was not prejudicial as jury found against plaintiff on second count].)

## DISPOSITION

The judgment is affirmed.  Defendants-Respondents are to recover their costs on appeal.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



EGERTON, J.

We concur:



EDMON, P. J.



LAVIN, J.